## GEORGE H. CLOWES vs. CHARLES MILLER.

Third Judicial District, Bridgeport, October Term, 1901.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

The mere fact that a valid contract exists under which the defendant agreed to transfer certain shares of stock to the plaintiff upon payment of a prescribed sum, does not entitle the plaintiff, as matter of right, to a judgment for its specific performance.

When specific performance of a contract is sought to be enforced, courts of equity will look to the substance of the transaction, the purpose of the agreement, and the real understanding of the parties, whether expressed in the written contract or not; and will never decree the specific performance of a contract when its enforcement would defeat the primary object of the agreement and the real understanding of the parties.

One of two partners died when the firm was indebted to an amount in excess of its available cash assets. To enable the executor to convert the value of his testator's interest in the partnership into cash, and to relieve the estate from liability for the partnership debts, he made an agreement with the surviving partner (which was ratified by all the testator's legatees and distributees) by which a corporation was to be formed to buy the partnership assets and assume its debts, and 3,700 shares of its preferred stock were to be issued to the executor for his testator's interest. When this had been done, the parties, to further carry out their original purposes, made a written contract, in part as follows : the preferred stock issued to the executor was to be sold by him to the plaintiff, who was the surviving partner, or to such persons as the plaintiff should procure, for $300,000, provided that amount was paid on or before May 1st, 1900; for every $400 paid to the executor he was to deliver to the purchaser five shares of the preferred stock; if the plaintiff should not have purchased and paid for all of such stock by May 1st, 1900, the executor was to sell the stock then remaining in his hands to the plaintiff, or to purchasers secured by him, for the difference between $300,000 and the amount received from sales before that date, plus ten per cent. If the executor's preferred stock was sold and paid for according to the terms of the agreement, before January 1st, 1901, the plaintiff was to receive a much larger proportion of the common stock placed in trust than he would otherwise become entitled to. In April, 1901, the plaintiff tendered to the defendant, who had assumed the executor's obligations, the price (figured at $400 for five shares) of just enough shares to give him, with his prior holdings, a majority of the stock, and demanded delivery of that number of shares; but did not offer

to purchase, nor to find a purchaser for, the remainder of the executor's stock. *Held* that the executor's obligation under that clause of the contract which required him to deliver blocks of five shares for $400 each, was only incidental to, in aid of, and contingent upon, a purchase of the entire stock for $300,000 or more, and therefore the plaintiff could not enforce that particular clause and disregard the other and controlling provisions of the agreement.

Argued November 7th—decided December 20th, 1901.

ACTION to enforce the specific performance of a contract to sell and deliver shares of stock, brought to the Superior Court in New Haven County where a demurrer to the complaint was overruled (*George W. Wheeler, J.*) and the cause was afterwards tried to the court, *Thayer, J.;* facts found and judgment rendered for the plaintiff, and appeal by the defendant for alleged errors in the findings and rulings of the court. *Error and judgment reversed.*

The following facts appear of record: From April 1st, 1886, until December 18th, 1898, the plaintiff and Edward F. Randolph carried on in Waterbury, in this State, the business of manufacturing and selling metal tubing and other metal goods, as partners, under the firm name of Randolph & Clowes; said Randolph furnishing the capital, and the plaintiff having the control and management of the business.

Edward F. Randolph died December 18th, 1898, and his nephew, O. W. F. Randolph, was duly appointed administrator with the will annexed, and the plaintiff as surviving partner of said firm of Randolph & Clowes continued to carry on said business until about August 1st, 1899.

Edward F. Randolph at the time of his death was possessed of a large property, more than sufficient to pay the legacies made in his will by several hundred thousand dollars, and one of the assets of his estate consisted of his undivided interest in the property of said partnership of Randolph & Clowes.

At the time of the closing of the business of said partnership and of the execution of the instrument, *Exhibit B\**,

---

\* EXHIBIT B.

Memorandum of agreement made this first day of August, 1899, between George H. Clowes, of Waterbury, Connecticut, and Obadiah W.

Clowes v. Miller.

there was due to the creditors of said partnership of Randolph & Clowes about the sum of $300,000, which claims were then

F. Randolph, as administrator with the will annexed of Edward F. Randolph, late of the city of New York, deceased.

The lands, assets, and good will of the late firm of Randolph & Clowes, doing business at Waterbury, Connecticut, and elsewhere, and all assets and property added thereto by George H. Clowes as surviving partner since the death of Edward F. Randolph, including all moneys in bank or on deposit, and United States patents, whether the same are in the name of Randolph & Clowes, George H. Clowes, or otherwise, . . . are to be transferred to a corporation recently formed under the laws of of the State of New Jersey, called Randolph-Clowes Company, in exchange for four thousand (4,000) shares of the preferred stock, and four thousand (4,000) shares of the common stock, capital stock, of said company, of the total par value of eight hundred thousand dollars ($800,000), of which stock three thousand seven hundred (3,700) shares of the preferred stock are to be issued to the said administrator, and three hundred (300) shares of the preferred stock and twelve hundred and fifty (1,250) shares of the common stock are to be issued to George H. Clowes, or to his order, and the remaining twenty-seven hundred and fifty (2,750) shares of the common stock are to be issued to the Corporation Trust Company of New Jersey as trustee, which stock is to be held by said Corporation Trust Company as trustee until January 1st, 1901, unless sooner disposed of by consent of both parties hereto, or their legal representatives; and said stock so held in trust is to be voted on at all elections or meetings, as directed by the said administrator, until that date. If the preferred stock so to be issued to said administrator is sold and paid for according to the terms of this agreement on or before January 1st, 1901, the twenty-seven hundred and fifty (2,750) shares of the said common stock are to be transferred to said Clowes; and if the said administrator's preferred stock is not so sold and paid for on or before January 1st, 1901, there are to be transferred by said Corporation Trust Company as trustee, to said Clowes, or his legal representatives, one thousand eight hundred and seventy-five (1,875) of said shares, and the remaining eight hundred and seventy-five (875) of said shares are to be transferred by said Corporation Trust Company as trustee to said administrator, his successors or assigns. . . .

The preferred stock so to be issued to said administrator he will sell to the said George H. Clowes, or to such persons as said Clowes may procure to purchase and pay for the same, for the sum of three hundred thousand dollars ($300,000), provided that the said sum be paid on or before May 1st, 1900.

For every four hundred dollars ($400) paid to the administrator he will deliver to the purchaser five (5) shares of said preferred stock.

If said Clowes shall not have purchased and paid for, or procured others to purchase and pay for, all of such stock on such terms by May 1st,

pressing for payment, and threatening the property of the estate of said Edward F. Randolph, which was amply solvent and abundantly sufficient to pay all the claims of the creditors of said partnership of Randolph & Clowes. The said Clowes then was, and ever since has been, without visible attachable property to satisfy said claims or pay his proportion or any considerable part thereof.

For the purpose of protecting the rights of all parties interested in the assets of said partnership and of effecting a division of its property among those entitled thereto, and adjusting the account between the plaintiff and the estate of said Edward F. Randolph, it was agreed on or about July 1st, 1899, between the plaintiff and said administrator, that the property of said partnership should be transferred to a corporation to be organized under the name of the Randolph-Clowes Company, $400,000 of the preferred stock and $400,000 of the common stock of which were to be issued and held, and the stock so issued was to be subsequently transferred in the manner stated in the written agreement thereafter executed by the plaintiff and said administrator, and said corporation was to assume the payment of the debts of said partnership.

Said corporation was duly organized, and of its $400,000 of preferred stock, $370,000 was issued to the administrator, and $30,000 to the plaintiff; of the common stock of $400,000, the plaintiff received $125,000 and the remaining $275,000 was issued to the Corporation Trust Company of New Jersey, to be held in trust as provided in said written agreement.

On September 5th, 1899, the said Randolph-Clowes Com-

---

1900, the administrator will sell the preferred stock then remaining in his hands to said Clowes, or such persons as said Clowes shall procure to purchase the same, at any time before January 1st, 1901, for a sum equal to the difference between the three hundred thousand dollars ($300,000) and the amount received by him from the sale of such stock before May 1st, 1900, and ten per cent of said sum in addition thereto.

It is understood that all moneys received by said Clowes from the sale of stock until January 1st, 1901, are to be paid to the said administrator on account of the purchase of stock as aforesaid. . . .

If this agreement is carried out and fulfilled by said Clowes it is to be in full settlement of all claims of the said administrator against him.

pany, as party of the first part, said administrator O. W. F. Randolph, of the second part, and the defendant of the third part, executed a written instrument (*Exhibit C*) for the transfer to the defendant of the administrator's interest in all said stock, containing the following provisions : " *First.* The party of the first part will forthwith execute his promissory note, payable to the third party twelve months after demand, in writing, for said sum of three hundred thousand dollars ($300,000), with interest payable semi-annually at six per cent from date thereof, for which third party agrees to pay over to the said first party said sum of three hundred thousand dollars ($300,000) in cash, and said first party will upon request execute a mortgage upon all its real estate, plant, machinery and tools, as collateral security for the payment of said note, payable according to the terms of said note.

" *Second.* The party of the third part agrees to pay to the party of the second part for his 3,700 shares of preferred stock, and his interest in the 2,750 shares of common stock held in trust by the Corporation Trust Company of New Jersey, the sum of one hundred thousand dollars ($100,000), taking said stock subject to all conditions of the agreement heretofore mentioned, dated August 1st, 1899, between George H. Clowes and second party, said third party to perform all the conditions of said agreement to be by the second party performed; said sum of one hundred thousand dollars ($100,000), to be paid as follows : . . . and upon delivery of said notes to second party he will deliver 3,700 shares of preferred stock indorsed in blank, and an assignment of all the right, title, and interest of second party in the 2,750 shares of common stock hereinbefore referred to. . . .

" Said money so loaned on mortgage, namely, three hundred thousand dollars ($300,000), to be paid immediately, and immediately used in payment of the debts of Randolph & Clowes, or so much thereof as may be necessary. . . . "

The second paragraph of the second defense, the allegations of which are found true, is as follows : —

" In order to provide a way and means of turning the en-

tire interest of the said Randolph estate into money so that the same might be duly administered and distributed, and relieving the estate from the obligations " (of the copartnership of Randolph & Clowes), " the agreements evidenced and referred to in plaintiff's *Exhibit B* were entered into, and said *Exhibit B* was executed by the said Randolph, administrator ; and that such only was the main and true cause and consideration inducing the said Randolph, administrator, to execute said *Exhibit B*, was known to and participated in by the said Clowes, and urged and presented by him as such cause and consideration to the said Randolph, administrator. Within a few days of the date of the instrument conveying the stock in question to the defendant (*Exhibit C* of the complaint), the plaintiff was informed fully of the transaction, and a copy of the instrument was given to his counsel."

On the 18th of April, 1901, the plaintiff, with several gentlemen from Buffalo from whom he had borrowed the money for the purpose, tendered to said administrator $72,800, and demanded of him the delivery of 910 shares of the preferred stock of said Randolph-Clowes Company, and on the same day made a similar tender and demand of the defendant's attorney, both of which tenders and demands were refused.

One of the paragraphs of the complaint alleges, and said allegations are found true, that of the $800,000 outstanding capital stock of the Randolph-Clowes Company, the plaintiff is the owner and holder of $122,500 of the common stock at its par value, and the equitable owner of $187,500 at its par value of the common stock held in trust by said Corporation Trust Company of New Jersey; and that upon the transfer of said $91,000 of the preferred stock, which was refused, he would become the owner of $401,000 of the stock, being a majority of all the stock, the possession of which would give him a controlling voice in the management and affairs of said Randolph-Clowes Company.

The complaint asked for a judgment compelling the defendant to transfer and deliver to the plaintiff $91,000 par value of the preferred stock of said company, upon payment by the plaintiff of the sum of $72,800.

The defendant claimed that upon said facts the plaintiff was not entitled to a judgment in equity compelling the transfer of said 910 shares of stock upon the payment of $72,800.

The court rendered a judgment requiring the defendant to transfer 910 shares of said stock to the plaintiff upon the payment by him of $72,800.

*Henry Stoddard* and *Goodwin Stoddard*, with whom was *Lucien F. Burpee*, for the appellant (defendant).

*Charles N. Morgan* of New York, *John O'Neill* and *Edward A. Harriman*, for the appellee (plaintiff).

HALL, J. The sole purpose of this action is to enable the plaintiff, and those who may be associated with him, to purchase a controlling interest in the Randolph-Clowes corporation.

The only reason shown by the pleadings, or by the facts found, for compelling the defendant to transfer to the plaintiff the shares in question, is the one alleged in the complaint, that the transfer to him of the 910 shares will, with the 3,100 shares which he claims now to own, give him a majority of the 8,000 shares of stock of the company which have been issued, and "a controlling voice in the management and affairs thereof."

No equitable ground is stated in the complaint, nor does any appear in the facts, why the management of the business and affairs of this corporation should be taken from the defendant and given to the plaintiff, excepting that it is claimed that by the terms of *Exhibit B*, the defendant's assignor, O. W. F. Randolph, administrator, contracted to sell to the plaintiff for the sum tendered the 910 shares demanded, and that the defendant Miller, by *Exhibit C*, purchased the 3,700 shares of preferred stock from said administrator, subject to the conditions of said agreement between the administrator and the plaintiff.

*Exhibit B* contains no express promise to sell to the plain-

tiff just enough shares of stock to give him the control of the company, nor is it either alleged in the complaint or found proved that the provision in that contract for the delivery to the purchaser of five shares of the preferred stock for every $400 paid to the administrator, was for the purpose of enabling the plaintiff or any other single purchaser to obtain a controlling interest in the stock of the company. On the contrary, from the language of this provision, and from the financial inability of the plaintiff to purchase the stock, it seems to have been the understanding of the parties that the stock would or might be sold in small blocks to various purchasers, and that no one person would become the owner of a majority of the stock.

The only grounds, therefore, upon which the plaintiff can ask a court of equity for a decree of specific performance are, that by *Exhibit B* the administrator contracted to sell, at the time the tender was made, and at the price fixed by the tender, to the plaintiff or to such persons as he might procure to purchase the same, the whole or any part of the 3,700 shares of preferred stock held by the administrator, and that the enforcement of said contract, to the extent of compelling the transfer to the plaintiff of the demanded 910 shares, is necessary in order to give him a controlling interest in the stock of the company.

Without deciding that a court of equity may not, under any circumstances, decree the specific performance of a contract for the sale of a controlling interest in the stock of a corporation, we shall confine ourselves to the question of whether, upon the facts in this case, the equitable relief asked for can be properly granted, for the purpose of enabling the plaintiff and those interested with him to gain control of this company.

We think it was clearly intended by the provision in *Exhibit B*, for the delivery to the purchaser of five shares of the preferred stock for every $400 paid, that upon the payment of that sum—certainly at any time prior to May 1st, 1900, if not after that date—the five shares should not only be delivered to the plaintiff or other purchaser, but that the

title to such stock should be at once properly and legally transferred to him, and that therefore, by that clause of the agreement, the administrator contracted to transfer to the plaintiff the 910 shares when they were demanded and the $72,800 tendered on April 18th.

But the mere fact that at the time the tender was made there was a contract, valid in law, by the language of which the administrator undertook to deliver to the plaintiff, on that date, the demanded shares upon payment of the sum tendered, does not entitle the plaintiff as a matter of right to relief in equity by a judgment of specific performance. " The equitable remedy of the specific enforcement of contracts, even when they are valid and binding at law, is not a matter of course ; it is so completely governed by equitable considerations, that it is sometimes, though improperly, called discretionary ; it is never granted unless it is entirely in accordance with equity and good conscience. It is therefore a well-settled rule that in suits for the specific performance of agreements, even when written, the defendant may by means of parol evidence show that through the mistake of both or either of the parties, the writing does not express the real agreement ; or that the agreement itself was entered into through a mistake as to its subject-matter, or as to the terms. In short, a court of equity will not grant its affirmative remedy to compel the defendant to perform a contract which he did not intend to make, or which he would not have entered into had its true effect been understood." 1 Pomeroy's Eq. Jur. (2d ed.) § 860 and note ; 2 Story's Eq. Jur. (13th ed.) § 742.

When the specific performance of a contract is sought to be enforced, courts of equity will look to the substance of the transaction, to the purpose of the agreement and the real understanding of the parties, whether expressed in the written contract or not, and will never decree the specific performance of a contract when its enforcement will defeat the primary object of the agreement and the real understanding of the parties. *Meeker* v. *Meeker*, 16 Conn. 403, 407 ; *Canterbury Aqueduct Co.* v. *Ensworth*, 22 id. 608, 613 ; *Patter-*

son v. *Bloomer*, 35 id. 57, 63; *Quinn* v. *Roath*, 37 id. 16, 24; *Platt* v. *Stonington Savings Bank*, 46 id. 476; *Van Epps* v. *Redfield*, 68 id. 39, 46.

It is the contention of the defendant that it appears, by the language of *Exhibit B*, and by the facts proved, to have been the purpose of the contract and the intention of the parties, not that the plaintiff should gain control of the corporation by purchasing just enough of the preferred stock to give him a bare majority of all the stock, but that the administrator should, at any time before January 1st, 1901, sell to the plaintiff or to such persons as he might " procure to purchase and pay for the same," the entire 3,700 shares of preferred stock held by him, at the price of $300,000, or at that rate for such part of the purchase as might be made prior to May 1st, and at a higher price for that remaining unsold after that date; that the provision for the delivery of five shares for every $400 paid, was to aid the accomplishment of the primary object of the contract, namely, the sale by the administrator of the entire 3,700 shares of preferred stock; that the tender of April 18th was manifestly made, not with the view of thereafter purchasing the remainder of the stock, but for the purpose and with the intention of not buying at any time more than said 910 shares; that the $72,800 was intended as full payment for the shares demanded, and that for these reasons the trial court erred in rendering a judgment ordering the defendant to transfer to the plaintiff the 910 shares.

We think the facts before us sustain the defendant's contention. As administrator of the estate of Edward F. Randolph, O. W. F. Randolph naturally and properly desired to relieve, as soon as possible, the other property of that estate from the burden of the several hundred thousand dollars of debts which should be borne by the assets of the partnership of Randolph & Clowes, and to obtain whatever might be due such estate upon the settlement of the partnership business. To accomplish these ends it seemed necessary that the interest of the Randolph estate in the partnership assets should be turned into cash, and to carry out these and

other purposes the plan of transferring the partnership as-
sets to a corporation, and issuing stock and providing for
the sale of that issued to the administrator, seems to have
been adopted.

The court has found that *Exhibit B* was executed by the
administrator " in order to provide a way and means of turn-
ing the entire interest of the said Randolph estate into
money, so that the same might be duly administered and
distributed, and relieving the estate from the obligations "
of the partnership of Randolph & Clowes, and "that such
only was the main and true cause and consideration inducing
the said Randolph, administrator, to execute said *Exhibit
B*, was known to and participated in by the said Clowes and
urged and presented by him as such cause and consideration
to the said Randolph, administrator."

These being the well-understood objects of the adminis-
trator in executing *Exhibit B*, the use which the plaintiff is
now seeking to make of the contract, assuming that its lan-
guage will admit of the construction which he gives to it, is
in clear conflict with the purpose for which it was intended.
If, as claimed by the plaintiff, he is entitled by the terms of
the contract to elect to purchase only such number of shares
as will give him a majority of the entire stock, and the de-
fendant is required to sell him that number, then instead of
aiding the administrator by enabling him to turn into money
the entire interest of the Randolph estate in the partnership
assets, the practical effect of the contract is to empower the
plaintiff, by purchasing only a small part of the administra-
tor's stock, and without having provided means for the pay-
ment of the partnership debts, to deprive the administrator
of his control of the company, provided for by the contract,
and to probably render much less valuable, if not unsaleable,
the large number of shares remaining in the administrator's
hands.

But turning to the language of the contract itself, we think
it fails to sustain the plaintiff's claim that he is entitled to
elect to purchase only the 910 shares demanded, and at the
price tendered. It is only the precise offer made and upon

the conditions proposed, which the plaintiff can claim the right to accept and can ask a court of equity to enforce. *Schields* v. *Horbach*, 30 Neb. 536.

What stock, by the language of *Exhibit B*, did the administrator offer to sell to the plaintiff, and at what price ? The first words of the offer are : " The preferred stock so to be issued to the administrator he will sell to the said George H. Clowes, or to such persons as said Clowes may procure to purchase and pay for the same, for the sum of three hundred thousand dollars ($300,000), provided that the said sum be paid on or before May 1st, 1900." The preferred stock "so to be issued to the administrator" was, by the terms of the contract, 3,700 shares. This is, therefore, an offer to sell at any time prior to May 1st, 1900, the entire preferred stock held by the administrator, for a fixed sum ; the sale to be made to one or more persons, but the whole stock to be sold to all.

Another clause of the contract provides for the sale after May 1st, 1900, at a higher price but for a fixed sum, of the preferred stock then remaining in the hands of the administrator. This is an offer to sell after the 1st of May, 1900, the entire stock held by the administrator, whether there then remained in his hands the whole or only a part of the 3,700 shares issued to him. It is apparently not claimed by the plaintiff, that he was entitled under this or any other part of the agreement to purchase after May 1st only a controlling interest in the company. But it is urged that the clause of *Exhibit B* which provides that the administrator will deliver to the purchaser five shares of preferred stock for every $400 paid to him, gave to the plaintiff the right to elect to purchase, prior to May 1st, only such number of blocks of five shares as was required to give him a majority of the stock of the company. Why he should be only enabled to elect to purchase a bare majority of the stock prior to May 1st is not clear. That he should be able to gain control of the company without purchasing all the preferred stock is inconsistent with the provision giving the adminis-

trator the right to vote on the common stock issued to the Corporation Trust Company.

For the purpose of aiding the plaintiff to effect the real object of the agreement to purchase all of the preferred stock, this clause undoubtedly enabled the plaintiff to procure, at least prior to May 1st if not after that date, a transfer to purchasers upon the payment of $400 for every five shares, of any number of such blocks, though that number was less than the entire 3,700 shares. But the inquiry here is whether he was permitted to procure the transfer of even one block of five shares for any other purpose than that of effecting a sale of the entire 3,700 shares; whether this particular provision of the offer is one which he could accept without accepting the entire offer. We think it is not, but that when read in connection with the other provisions of the contract for the sale of the entire stock, and in the light of all the facts, it should be considered as merely providing a method for aiding the plaintiff to carry out the main purpose of selling the entire 3,700 shares.

But at what price was the administrator to sell the plaintiff the preferred stock? The plaintiff evidently assumed by his tender that by the terms of the contract $72,800 was to be accepted in full payment for 910 shares of preferred stock. No claim is made that prior to January 1st, 1901, the time limiting the plaintiff's right of purchase, or even since that date, any further sum has been tendered or any further offer of purchase made. The contract first provides that the administrator will sell the 3,700 shares for $300,000, provided that sum be paid before May 1st, 1900. Does the next clause provide, as would seem to follow from the plaintiff's interpretation of it, that the administrator will sell the same stock within the same period for $296,000? If so, the provision fixing the price at $300,000 seems to be meaningless. Does the clause providing for the delivery of five shares upon the payment of every $400, mean that prior to May 1st the administrator will sell any portion of his stock at a less price per share than he will sell the whole? We think such cannot be the correct interpretation of it.

As we view the contract, and it is not wholly free from ambiguity, it provides that the administrator shall ultimately receive not less than at the rate of $300,000 for 3,700 shares, for any stock sold; that the entire 3,700 shares may be purchased for $300,000 at any time prior to May 1st, and after that date and prior to January 1st, 1901, at a higher rate for either the entire 3,700 shares or those remaining unsold; that at least prior to May 1st, if the entire stock cannot be sold in one lot, partial sales will be made and lots of five shares will be transferred upon payment of every $400, and that the amount thus received will be paid to the administrator and credited to the plaintiff upon the price to be paid under the agreement, the deficiency to be made up by an increase in the price of the stock afterwards sold or by subsequent payments before the 1st of January, 1901. The clause near the close of the contract provides that " it is understood that all moneys received by said Clowes from the sale of stock until January 1st, 1901, are to be paid to the said administrator on account of the purchase of the stock as aforesaid; " and finally that " if this agreement is carried out and fulfilled by said Clowes it is to be in full settlement of all claims of the said administrator against him." These clauses, we think, throw some light upon the meaning of the provision for the sale of five-share lots, and are in conflict with the plaintiff's claim both as to the price to be paid for the shares and as to his right to elect to purchase only a majority of the stock.

The plaintiff has no greater right to enforce a sale of a bare majority of the preferred stock against the defendant than he had against the administrator. By his agreement of purchase from the administrator (*Exhibit C*), the defendant became bound as to the plaintiff only for the performance of the conditions of the contract contained in *Exhibit B*.

By the sale of his entire stock to the defendant, the administrator appears to have received $100,000, and to have secured for the corporation the means of paying the copartnership obligations, for which the Randolph estate was holden, and the defendant, in order to procure the control

of the corporation, appears to have paid $100,000 to the administrator and to have advanced $300,000 to the corporation to enable it to pay the debts of the partnership which he had assumed.

Upon the facts before us we think it is contrary to well-established equitable principles to compel the defendant to transfer to the plaintiff the 910 shares demanded upon payment of $72,800, for the purpose of enabling the latter to obtain the control and management of the Randolph-Clowes Company.

The case having been finally tried upon its merits, it is unnecessary to inquire whether the demurrer to the complaint was properly overruled.

There is error in the judgment of the Superior Court and it is reversed.

In this opinion the other judges concurred.