**PLIMPTON v. MATTAKEUNK CABIN COLONY, Inc.**

**SPELLACY v. FARLEY et al.**

No. 1947.

District Court, D. Connecticut.
June 6, 1934.

See, also, 6 F.Supp. 72.

Lampke & Stein, of New York City (Samuel D. Stein, of New York City, of counsel), for receivers.

Allin, Tucker & Allen, of New York City (Lewis M. Isaacs and George L. Allin, both of New York City, of counsel), for executors.

THOMAS, District Judge.

This matter is now before the court on the rule nisi issued June 27, 1933, directing the executors' testator, Robert E. Farley, to show cause why he should not specifically perform his contract to purchase real estate in custodia legis herein, pay damages accrued to the estate in receivership by reason of his alleged anticipatory breach; or, in the alternative, why the property should not be ordered resold at his risk, he to respond to any loss resulting from resale and from prior accrued damage. The rule further directed him to show cause why, if he proved recusant, he should not be punished for contempt and why, pendente lite, he should not be enjoined from transferring any of his assets.

On August 29, 1933, Farley appeared generally with respect to all portions of the rule which required him to show cause why he should not specifically perform his contract and/or pay money damages, but, on the ground that he had been served without the District of Connecticut at his home in White Plains, N. Y., where he had been for some time confined by illness, he appeared specially with respect to that portion of the rule which required him to show cause why he should not respond to the additional incidental relief prayed for and be amenable to contempt proceedings, if he proved recusant. In opposition to the rule he served answering affidavits asserting that title to the property was unmarketable, and he prayed that the rule be discharged and that he be relieved of paying the balance of the purchase price, about $150,000, and that his $10,000 deposited under the contract be returned with interest. Thereafter, the receivers served reply affidavits. On September 28, 1933, and shortly before the matter was to have been argued, Farley suddenly died.

This proceeding was accordingly continued until the appointment of an executor of the Farley estate. On October 14, 1933, letters testamentary issued out of the Surrogate's Court, Westchester county, N. Y., to his executors, and there was then served on them a writ of scire facias issued by this court pursuant to Revised Statutes, § 955 (28 USCA § 778) to appear and be substituted herein for their testator, the deceased respondent. In response to the writ, the executors appeared here specially and moved to quash the writ. In the opinion filed February 17, 1934, and reported in (D. C.) 6 F.Supp. 72, I concluded that, both on the authority of decided cases and likewise on principle, the executors' motion must be denied, and, in accordance with the order entered thereon, the executors filed their general appearance in this proceeding, reserving, however, the rights and objections theretofore raised; and the pending issue was argued on its merits on April 2, 1934.

Accordingly, I am now deciding the controversy on its merits and the question presented is this, Was Farley's attempted rescission justified because of the unmarketability of title as he contended, or did he, as the receivers contend, commit an anticipatory breach? If he did, then I am also to determine what remedy under all the circumstances shall be applied against his executors and the testamentary estate.

The general rule respecting a vendor's title is stated in vol. 3, § 1405, of Pomeroy's Equity Jurisprudence. The author says:

"The vendor's title must be free from reasonable doubt. In suits by a vendor the purchaser will not be compelled to complete the contract, unless the title is free from any reasonable doubt."

The authorities sustain the rule that while the title need not be fatally defective to relieve a vendee of specific performance, on the other hand it need not be perfect to entitle the vendor to that relief; a fortiori, in respect of relief in the form of money damages. In view of this rule, I am not called upon to decide whether the title was perfect.

In the absence of perfection or an instrument of precision to determine the marketability of title, courts apply the tests developed by the market place where reasonableness must prevail. In this suit involving a contract made and to be performed in Connecticut with respect to land in this state, the matter is governed by the law of this state except as to all questions of the power of federal courts and of procedure therein.

In a recent decision of the Supreme Court of Errors of Connecticut, defining marketability of title—Perkins v. August, 109 Conn. 452, on page 456, 146 A. 831, 832—Judge Maltbie, writing for that court, said:

"Even though we assume that in all such agreements, unless a contrary intent appears, the law implies a promise by the vendor that the title which he conveys shall be a good marketable title, the rule at its broadest would not mean that a mere suspicion cast upon the title will be regarded as sufficient to make it

unmarketable, Conley v. Finn, 171 Mass. 70, 72, 50 N. E. 460, 68 Am. St. Rep. 399; 27 R. C. L. 490; but the defect must have at least such substantial weight that the land cannot again be sold at a fair price to a reasonable purchaser or mortgaged to a person of reasonable prudence as a security for the loan of money. Moore v. Williams, 115 N. Y. 586, 592, 22 N. E. 233, 5 L. R. A. 654, 12 Am. St. Rep. 844; Maupin, Op. Cit. p. 769; 27 R. C. L. 490."

And further at page 457 of 109 Conn., 146 A. 831, 833:

"While it is frequently said that, if parol evidence will be necessary to remove a doubt as to the validity and sufficiency of the vendor's title, the purchaser cannot be compelled to complete the contract, an examination of the cases will show that this is far from an invariable rule, where the agreement is one merely to give a good marketable title. Even in states where the vendor is held to as strict a rule in this regard as anywhere, title by adverse possession has been held sufficient. Conley v. Finn, 171 Mass. 70, 73, 50 N. E. 460, 68 Am. St. Rep. 399; Freedman v. Oppenheim, 187 N. Y. 101, 105, 79 N. E. 841, 116 Am. St. Rep. 595."

The respondents cannot be said to dispute the above test of marketability for they, too, rely upon and quote from Moore v. Williams, the New York case cited by Judge Maltbie in the Perkins Case, supra. In that case, page 592 of 115 N. Y., 22 N. E. 233, 234, Judge Earl said:

"A purchaser will not generally be compelled to take a title when there is a defect in the record title which can be cured only by a resort to parol evidence, or when there is an apparent incumbrance which can be removed or defeated only by such evidence; and, so far as there are any exceptions to this rule, they are extraordinary cases, in which it is very clear that the purchaser can suffer no harm from the defect or incumbrance."

The receivers' counsel further rely upon and quote from Todd v. Union Dime Savings Institution, 118 N. Y. 337, 23 N. E. 299; also in Id., 128 N. Y. 636, 28 N. E. 504. On page 638 of 128 N. Y., 28 N. E. 504, 506, the Court of Appeals stated the rule as follows:

"A purchaser (of real estate) is not entitled to demand a title absolutely free from all suspicion or possible defect. He may claim a marketable title, and that means a title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and ought to accept."

Thus, it will be observed that even in New York, where a heavier burden is placed upon the vendor than in Connecticut, a title is none the less marketable though it be not absolutely free from all suspicion or possible defect. It will also be observed that the New York Court of Appeals holds the buyer to a standard of good faith. He must be "willing and anxious to perform his contract," an element of special significance here, in an equity cause, and where a judicial contract is involved, and where, as contended by the buyer's executors, the plea for specific performance against them is addressed to the court's discretion. The Connecticut courts, when called upon to determine whether there existed any reasonable doubt of marketability of title, and whether specific performance will be decreed, apply flexible principles and adopt that rule which, on the facts of the particular case, will work a substantially equitable disposition of the problem. The decisions also indicate that the court, besides giving due weight to general principles of equity jurisprudence, consider particularly: (1) Whether the alleged incumbrance is of a substantial nature; (2) whether the buyer contracted with knowledge of the state of the title or with knowledge of the particular alleged incumbrances; (3) whether a reasonable opportunity was afforded the seller to clear title; and (4) if there occurred an anticipatory repudiation by the buyer, the seller is excused from any further attempt to clear the title. See as illustrations Perkins v. August, supra; Romanoff v. De Santo, 101 Conn. 504, 126 A. 694; Stavnezer et al. v. Cooley, 115 Conn. 452, 161 A. 863; Clowes v. Miller, 74 Conn. 287, 50 A. 728. Thus, in the Clowes Case, the rule is expressed by Judge Hall at page 295 of 74 Conn., 50 A. 728, 731:

"When the specific performance of a contract is sought to be enforced, courts of equity will look to the substance of the transaction, to the purpose of the agreement, and the real understanding of the parties, whether expressed in the written contract or not, and will never decree the specific performance of a contract when its enforcement will defeat the primary object of the agreement and the real understanding of the parties." Citing cases.

In the Romanoff Case, supra, the court found that there was outstanding a lease to a greenhouse on the land; that the record title had not yet been transferred to the contract seller; that provision had not yet been made for financing mortgages; and that the pro-

posed deed had been incorrectly drawn, yet the court decided that the parties contracted with knowledge of the greenhouse lease though it was not expressly mentioned as an incumbrance, and that it did not appear that the other objections would not have been removed but for the buyer's direct refusal to perform, and that in a suit to recover money damages, the anticipatory breach relieved the plaintiff of the duty to continue to perfect his title. On the other hand, in the Stavnezer Case, supra, the court held the buyer was relieved because the seller, long after the contract, voluntarily encumbered the property by a sewage right of way grant to the city whereby the future owner became bound to pay city assessments of an unknown amount.

■ With these general rules as a guide, I reach the conclusion in the case at bar that there was no reasonable doubt as to the marketability of the title and that Farley, the vendee, committed an anticipatory breach when on November 25, 1931, he gave notice that he would not accept title.

■ Before considering the specific objections urged in behalf of the vendee to cast reasonable doubt upon the title's marketability, I reach the conclusion that there is no escape for the vendee on the theory later suggested by his executors that even if the title was free from reasonable doubt, he was relieved of his bargain by reason of the vendors' alleged delay in perfecting title. On the contrary, the vendors, at the inception of this suit, complained that while they at all times were free of fault in that respect, the vendee himself, by his own conduct and in the face of protest by the vendors, delayed and impeded in bad faith the perfecting of title. Against the considerable and convincing evidence to that effect, the vendee, in his answer, contented himself with a brief general denial, which is refuted in the reply affidavits. Disregarding delays, avoidable or otherwise, on the part of the persons not subject to the control of either party, e. g., the surveyor and the title company's examiners, the record leaves no doubt but that as between vendors and vendee, the former acted with reasonable dispatch under the circumstances, while the latter was not free of fault in that direction and, under the pressure of economic conditions, desired postponement of a title closing. My reasons for reaching these conclusions will appear more fully in my discussion of other questions. On the record, I do not think the element of time became an issue; the contract itself did not make time of the essence; the closing date was by clear implication movable; and I am considering the question at this point only be-

cause counsel for the executors have raised this issue. At any rate, whether or not it be material, I find that if either party was at fault, it was the vendee and he may not justly be relieved of his contract on the ground of mere delay on the part of the vendor in perfecting title.

■ If, as I conclude, there had not expired the time within which, expressly or impliedly, the receivers were bound to tender title, then Farley's direct repudiation was an anticipatory breach which, if the alternative remedy of money damages is to be applied, then under the authorities the breach relieved the receivers from perfecting the title if we assume at that time it was not yet marketable. Romanoff v. De Santo, supra. If the remedy of specific performance is to be applied, then under the authority of Batchelar v. Batchelar, 244 N. Y. 274, 155 N. E. 123, the receivers had a reasonable time within which to perfect title. Farley's executors have now suggested that a different rule applies in the case of a judicial sales contract, and they refer to Batchelar v. Batchelar, 244 N. Y. 274, 155 N. E. 123. But I find therein nothing to sustain their view. The case is really, if anything, authority against them. The Court of Appeals decided that a motion by the purchaser at judicial sale to be relieved of his contract because of vendor's delay in perfecting title is addressed to the discretion of the court and the rule to be applied is that of fairness under all the circumstances of the particular case. Judge Pound's opinion at page 277 of 244 N. Y., 155 N. E. 123, 124, reads:

"When a reasonable time has elapsed after closing day, and the title remains defective, the purchaser may move the court to be relieved from his purchase. The court may, as the facts permit, in its discretion, deny the application absolutely or conditionally or may grant it, and its determination may not be reviewed in this court. * * * The whole matter is before the Special Term, which applies the rule of fairness. If the defect in title is curable, it may give the referee time to remove the cloud. It is no abuse of discretion to refuse further time, when it does not appear that the title may be perfected with reasonable diligence. More especially may it exercise such discretion in behalf of the purchaser in a case like this, where the referee has resigned or attempted to resign, and notice to him would be a barren formality."

An examination of all the facts and of the court's opinion in that case will disclose that the case sustains the proposition that in the case of a judicial sale the vendee may not toll

the vendor's time to complete title without first issuing a caveat addressed to the court, who must then decide whether it is fair that a further period be allowed for perfecting title. A vendee's arbitrary notice that he will wait no longer is a nullity. And in Connecticut, as we have seen supra in the case of a non-judicial sale, such a direct repudiation, in a plea for money damages, relieves the vendee of the duty to complete title.

In the instant case, Farley's repudiation occurred November 25, 1931. This suit was commenced June 27, 1933. The long interval was consumed in protracted but abortive negotiations for a compromise settlement to avoid this litigation. As will hereinafter appear, Farley indicated a willingness to complete his bargain provided the purchase price and cash requirements were drastically reduced, to reflect the changed economic conditions. The principal creditors were willing to make a sacrifice of their own interests to grant the concessions, but it was found impossible to obtain an unconditional commitment from Farley, and so this proceeding was commenced.

In answer thereto, there was presented in Farley's behalf in August, 1933, twelve specific alleged objections to the title, contained in the affidavits respectively of Farley, Tracy, and Flanagan. Farley contented himself with a general denial of the charges of delay and bad faith made against him in the voluminous moving papers and he referred to the affidavit of Tracy, a lawyer, for a statement of specific objections to title. Farley admitted, however, that his main and practically the only essential objection involves the question whether the various and numerous proceedings had herein were effective in transferring from the land to the proceeds of sale any rights, if they still existed, in favor of stockholder-lessees of the Cabin Colony under instruments purporting to be leases of building lots and which had been issued by the Colony to some of its stockholders. And it will be found that of the twelve specific objections, seven relate to this lease question and of the seven, three are directed toward the proceedings of April, 1930, and January–February, 1931, embracing the sale of the property to Farley. Against these two proceedings is directed the spearhead of attack. Of the four other objections directed to the lease question, two attack proceedings herein prior to April, 1930, one the proceeding of September, 1931, and one a condition alleged to exist in August, 1933. The remaining objections do not relate to the allegedly all-important lease question. It is necessary, at

some length to discuss them and I purpose dealing first with the lease objections and then those unrelated thereto, and that they may be understood, I must recite the facts in the light of which they must be weighed.

Accordingly, I shall now state what I consider to be the material facts disclosed by the voluminous record. On the present issue there is before me not only the moving, answering, and reply papers on which the rule issued, papers with their attached exhibits totalling several hundred pages, but the litigants, by express reference therein and by the briefs of their counsel, have made part of those papers, all the numerous proceedings had herein since February, 1928, comprising a mass of documents aggregating many additional hundred of pages.

The defendant corporation in receivership, and hereinafter called the Colony, was founded in 1920 by one Mallett who controlled it by majority stock ownership and continued himself in office as its president and completely dominated its affairs. It purported to be a quasi co-operative venture. The company's avowed object was to acquire large tracts of country property and to lease it in small building lots to its stockholders who alone were eligible to become leaseholders. The stock, by its express terms, was transferable only with the consent of the board of directors, and the so-called leases were likewise not freely assignable. Mallett directed his activities toward the artist, writer, musician, school-teacher type who were quite ignorant of commerce and business and were attracted by the prospect of remodeling a farm house or building a modest cabin as a summer refuge among like-minded congenial people of equally modest means, with whom they could foregather in a community clubhouse. To such folk, the legal and commercial effect of a corporate charter, by-laws, stock certificates, leases, mortgages, attachments, foreclosures, etc., were terra incognita. Yet it is significant of Mallett's skill in salesmanship that he succeeded in "selling" even a few business men who ought to have known better.

We are here concerned with the Colony's so-called Heartfields property situated about twelve miles from Danbury, Conn. In February, 1928, when the receivers were appointed, Mallett informed them the property comprised several thousand acres unsurveyed; the three appraisers appointed soon afterward reported that based on Mallett's designation of boundaries and the only other meager available data, they estimated the acreage at 2,000; but the actual survey and title examination, completed in 1931, disclosed a

mere 1,171.54 acres. There were scattered over the property, pockmarking it, thirty-one dwellings and a community clubhouse or inn. The property was encumbered by a blanket $100,000 mortgage, some small additional mortgages, attachments, one for $10,000, tax liens, etc.

The Colony also owned a 600-acre unimproved tract at Lyme, Conn., subject to a $15,000 first mortgage and a second purchase-money mortgage, proceedings to foreclose which for a balance of upwards of $65,000 due had been commenced prior to this receivership and in connection with which foreclosure an attachment for an almost inevitable deficiency judgment had been levied on the Heartfields property. The company had other creditors, no cash, and nominal income. By the date set by court order, unsecured creditors filed claims for over $70,000. When, therefore, this receivership was instituted by an unsecured creditor in February, 1928, the receivers were immediately confronted with the overshadowing threat of mortgage and similar foreclosures, which, though temporarily, could not be permanently stayed under the conditions as they developed. And it became obvious from the appraisals of the property made by order of the court and from subsequent developments, that unless the business could be profitably operated, rehabilitated, or reorganized with the active co-operation and financial help of the Colony members, the properties would have to be sold and that forced sales would not only jeopardize the interests of secured creditors, but would wipe out general creditors and, a fortiori, the stockholders and lessees whose so-called leases, with two exceptions, were recorded subsequent to mortgages and other senior liens.

The receivers at once caused the books to be posted with the help of Mallett, on whom alone they had to depend for information. The picture thus painted as to the number of stockholders, the number of lessees, the amount of accounts receivable, the amount of indebtedness, the attitude of most of the large creditors, all seemed to justify the conclusion that the Colony could be saved with the help of its members, and that that help would be forthcoming if there were removed the threat of the mortgage and similar foreclosures. That threat was averted by the generous action in the emergency by one of the receivers, Mr. Spellacy, who personally advanced his own funds and credit to the extent of over $60,000, and, as a result of that rescue party, while the situation was saved for those interested in the estate, Mr. Spellacy ultimately suffered the irreparable loss of about $30,000. The receivership was made permanent.

The receivers endeavored, but without success, to collect accounts receivable which were found to be owing almost entirely from Colony members. The receivers proposed as a plan of operation that lessees liquidate or adjust on an equitable basis, to be approved by the court, their indebtedness and surrender their at best dubious leases in exchange for new valid ones. The receivers had arranged with the senior lienholders to release the land to be embraced by the new leases from the senior liens in consideration of payment to the seniors of a portion of the funds obtained on the proposed adjustment and exchange. Similarly, upon the sale of any new leases to new prospects. Reductions of some senior liens had also been negotiated. Later, the plan was modified to provide for deeds instead of leases. These plans had been approved by orders of the court upon notice to all concerned. By various other orders, the time had been fixed for creditors to file claims or be barred and there had likewise, by various orders on notice, been fixed the time within which stockholders and lessees must cure their defaults or be barred, and after various extensions the time expired February 18, 1929. And though a group of lessees took an appeal therefrom, they discontinued it about a year later.

The efforts of the receivers, however, proved unsuccessful, the lessees being in most of the cases unable to meet their debts and yet hoping that by some miracle their cottages, representing often their life's savings, might be saved to them. In due course the receivers discovered the true situation, namely, that the policy had been to sell stock and leases at what the traffic would bear, naturally very little, considering the financial position of the members. Yet, even so, stock and leases had frequently been delivered without any payment and in many instances on mere promissory notes which for the most part had promptly been pledged to creditors. Lessees were in arrears for even the nominal annual rent reserved, a constant which would be insufficient over a period of years to meet even the taxes, a variable which naturally would tend to increase. The receivers discovered that the long list of stockholders was mainly sham and that of the lessees there were few who retained any active interest except those thirty-one who had built or remodelled dwellings, and even these, with few exceptions, were unable to pay their rent and/or other debts. The financial condition from time to time is set forth in the various audits filed herein. To relieve the situation somewhat, the receivers, in December 1929, by order of the court, after notice, and with the

approval of the interested parties, sold the Lyme property which was far less valuable, actually and potentially; but while this reduced carrying charges and administrative expense, it brought no cash, the buyer assuming the indebtedness on the land and surrendering for cancellation to the receivers for the balance of the purchase price about $35,000 of the outstanding receivers' certificates which he had previously acquired. There had been issued in all, $85,000 face value of such certificates, about $65,000 of which had been used in connection with mortgage discharge. There is at present outstanding about $50,000 of certificates.

By the spring of 1930, after the receivers had struggled two years to continue, reorganize, or rehabilitate the business, it became patent that without income, and with taxes on the sole remaining Heartfields property and administrative costs continuing, there remained as the only possibility of protecting the creditors and salvaging something for the lessees, an advantageous sale of the property. A forced sale would be disastrous. Market conditions had certainly become less favorable than in 1928 when the property had been appraised. It could not be advantageously converted into a private estate, for it was bisected by a recently completed state highway. To a prospective estate buyer, the clubhouse and various cottages, scattered over and pockmarking the property, so far from adding to its value, would detract therefrom. Moreover, such a sale would involve the eviction of those of the thirty-one families who more or less had continued to occupy the cottages; for regardless of their defaults in rent, they had not been evicted by the receivers as such action would have made impossible the attempts during two years to continue or rehabilitate the venture and would have given the property an appearance of abandonment and necessitated added expense of caretaking and preservation. Moreover, such a step, whatever its legal justification, would have worked cruel hardship upon these people who in reliance upon so-called leases had invested their savings in the construction or remodeling of these summer dwellings. On the other hand, the prospects were slight that the receivers would be able, during the year which followed the legal foreclosure of these tenants, to rent their homes to new tenants. If by nothing else, this was proved by the fact that the receivers, even with the help of Mallett's admitted skill in salesmanship, had been unable to consummate a single lease to a new prospect. Obviously, the kind of person most likely to pay the best price for the kind of tract being administered here was some experienced real estate developer. To him the very condition which made this property of less value to a private buyer made it of especial value for development purposes; for instead of having to build up his development from the beginning, he would here start with a nucleus of a clubhouse and thirty-one dwellings with at least that number of interested families. Such a person was Farley.

He was a man of long and wide experience in the development of suburban and country properties. He was of unquestioned financial responsibility. At the time of the making the contract he wrote the receivers that he owned outright, free of mortgage, real estate to the value of $2,000,000; and inquiry by the receivers corroborated his statement. He had recently acquired a neighboring tract at Candlewood Lake, which he was then engaged in developing. He had a long established and widely active real estate organization. He was personally familiar with this property. Moreover, he was an experienced lawyer. All in all he seemed the ideal purchaser for this property.

After negotiations during which, as is reflected in the instrument itself, the conditions affecting this property were fully considered, the contract dated April 9, 1930, was signed by Farley and the receivers, subject to this court's approval thereof to be obtained by May 1st, failing which, the $10,000 deposited by Farley was to be returned to him. Before discussing the proceedings taken thereon and which are now attacked, I shall first briefly digest the material provisions of this unusual contract and then of the old "leases":

1. The third preamble says the property has not been surveyed, its exact acreage is unknown, acreage recited in deeds is 1,206, "but the Buyer and the Sellers agree the actual acreage may be between fifteen hundred and two thousand, or more."

2. The fourth preamble recites that among other incumbrances of record, there is a $100,000 trust mortgage "and eighteen leases, the main particulars of which may be described as follows: A majority are for four and one-half acres each, total acreage about seventy-eight; only two, each of which is for four and one-half acres, are recorded prior to said trust mortgage; thirteen are defective as to witnesses and/or acknowledgment; with possibly a few exceptions all the leases contain no descriptions other than a lot number without reference to any recorded plan or map, and similarly are silent as to the term of the leasehold, and contain a clause whereby they

are subject to cancellation on thirty days notice, a pro forma copy of said leases being attached hereto marked Schedule 'B'."

3. The fifth preamble recites that "various alleged lessees and stockholders of the Colony have, in the opinion of the Sellers, been foreclosed by order of the Court of any right, title and interest they may have had as stockholders or lessees by reason of default in the payment of arrears of rent reserved in such leases, and/or other arrears."

4. Covenant 3 provides that the price is based upon exact acreage when determined by survey and shall be "$164,000 for 1200 acres; in the event there be less than said acreage, said price shall be reduced pro rata, to wit: $136.66 for each acre less than 1200; if more than said acreage, the Buyer will pay $125 per acre for each additional acre up to 300; if more than 1500 acres, the Buyer will pay $100 per acre for each additional acre up to 85; so that if there be a total of 1585 acres, the total price is $210,000. If there be more than 1585 acres, the Buyer shall have an option on such excess as hereinafter provided."

5. Covenant 5 provides that the purchase price shall be paid $10,000 on signing contract (same to be returned if the court does not approve contract before May 1, 1930); $90,000 upon closing of title, and the balance by five-year purchase-money mortgage with interest at 6 per cent. and amortization at the rate of $5,000 every six months.

6. Covenant 6 provides for selection of a surveyor and the cost of survey "to be borne one-half by the Sellers and one-half by the Buyer, unless the Sellers shall be unable to convey title to the property as hereinafter provided, in which event total cost of the survey shall be for the Seller's account. * * * Should the Buyer desire a complete traverse of the property by transit and steel tape with a closing error of not more than one in ten thousand, the extra cost shall be solely for Buyer's account."

7. Covenant 7 provides: "Title shall be closed 4 months from the time the contract has received the approval of the Court, unless an earlier or later date be mutually agreed upon; in any event, the place and hour of closing shall be fixed by the Sellers."

8. Covenant 8 says: "The conveyance shall be by customary right, title and interest deed, but it is mutually agreed that the title shall be good and marketable and free and clear of all encumbrances except," and then makes various special provisions for satisfying the $100,000 trust mortgage and similar items.

9. Covenant 9 recites: "In the event the Sellers be unable to close title as hereinbefore provided, no liability shall attach to them hereunder except for one-half of the aforesaid survey cost and except for the return of the $10,000 deposited by the buyer hereunder as aforesaid."

10. Covenant 10, which bears indorsement of approval by the broker, provides as to brokers' commissions that "no brokerage shall be payable if the Sellers be unable to convey title as hereinbefore specified."

11. The eleventh covenant is: "In addition to the purchase price hereinbefore specified, it is mutually agreed that with respect to leases, the Sellers will upon the approval of this contract, give notice of cancellation of all leases, but that the Buyer at the closing of title, or immediately thereafter, will do the following with respect to those lessees who have built dwellings and/or such other lessees who in the judgment of the Court should for equitable reasons be recognized, namely; he will give to such lessees a new lease of either a quarter of an acre or half an acre, at the option of the lessees, the term of which leases shall be for five years from the said date of closing title, and at a rental of $50 per annum if the lease be for quarter of an acre, and $75 per annum if it be for half an acre, rent payable semi-annually in advance, and with the privilege to the lessees of a further extension of said leases for an additional five year period at a 30% increase in the rental figure, provided ninety days written notice be given to the Buyer by the lessee prior to the expiration of the initial five year term. The lines of such property so to be leased shall be determined by the Buyer after an actual survey shall have been had for the purpose of locating any dwellings, the cost of such survey to be for the account of the Buyer. The Buyer covenants that he will also pay the taxes on the land lease, the tenant to pay taxes on the building and if the tenant fail to pay taxes on the building within six months from the time they become due, the Buyer, as landlord, to have the privilege of paying such taxes and adding the same to the rental. The Buyer covenants that all parcels so leased shall, during the period of the lease, have access to the public highway. In other words, it is the intention, and the Buyer covenants, to assure to all such lessees possession of their houses for a period of ten years, aside from the privilege to purchase, as hereinafter provided."

298

12. The twelfth covenant is: "The Buyer further covenants that within one year after said closing of title and promptly after the necessary surveying and subdividing has been done, he will prepare a schedule of selling prices, copies whereof will be sent by registered mail to all tenants under leases mentioned in the last preceding paragraph; and each such tenant shall have the option to purchase, within ninety days of such mailing, the plot so leased, but at 15% less than the bona fide schedule price; and if the option be exercised, one half the purchase price shall be payable in cash and the balance by purchase money mortgage for three years, with interest at 6%; and in the event the house of any such tenant be worth at least twice the purchase price of the land, the entire purchase price, at the tenant's option, may be by purchase money mortgage for three years at 6%. The Buyer further covenants that in the event any such tenant desires to purchase land contiguous to the parcel leased as aforesaid, the Buyer will give such tenant a preference over others at the bona fide schedule price."

13. The thirteenth covenant provides that for the protection of the buyer and other tenants, the buyer need not grant the new leases called for under the eleventh covenant "to any tenant whose building is clearly offensive and unsightly; but if there be any dispute as to whether a building is or is not offensive, the matter shall be left for decision to two disinterested arbitrators to be appointed by the Court. * * *"

14. The fourteenth covenant is: "The Buyer declares that as he has recently purchased a large tract of land on Candlewood Lake, it is his intention, though it shall not be deemed a covenant, to grant to all tenants under the new leases hereinbefore mentioned, water and boating privileges on Candlewood Lake; and that the Buyer intends to expend very substantial sums in developing said property, and the property purchased hereunder, and in that connection to provide a club-house, docks and boat houses, and to grant to such tenants privileges in connection with such improvements."

I need hardly refer to the undisputed additional evidence in the record confirming the fact, patent on the face of the instrument itself, that the parties recognized they were making not a simple contract for the purchase and sale of real estate, but rather an unusual one and calling for patience and co-operation on both sides in disposing of problems whereof they were both aware. The record also shows that it was Farley himself, a lawyer and experienced operator, who worked out the plan in the contract whereby lessees were assured of a preferential right to purchase and in any event, ten years occupancy under the new leases to be granted by him.

Now, to make a digest of the "leases" (a pro forma copy of which was attached to the contract) and of the undisputed part of the record in reference thereto:

1. A lessee became a lessee in consideration of his purchase of shares of stock of the Cabin Colony. The record shows in many instances that lessees frequently never paid the purchase price of the stock.

2. The lease reserved a fixed sum of annual rent payable in advance, probably insufficient to meet even taxes over a period of years. Moreover, lessees, with few exceptions, continued in default after the grace period of over a year under court orders had expired in February, 1929.

3. The lease by its express terms could not be assigned nor transferred to any other person without the written consent of the lessor.

4. No term of tenure is mentioned in the lease, merely "during such period of time only as the lessee, his heirs or assigns shall personally own the certain shares of stock herewith purchased and for no longer," yet

5. The shares of stock were by their express terms not transferable except with the written consent of the company's board of directors.

6. For a description of the premises leased, the lease states (covenant "first"):

"That the said party of the first part, for the consideration above related, and in consideration of the rents and covenants hereinafter specified and contained, have granted, demised and to farm let, and by these presents do grant, demise and to farm let, unto the said party of the second part a building lot of one-half acre, and four acres of landscape grounds surrounding or contiguous to said half acre building lot, in all four and one-half acres of land and no more, situate, lying and being in, and being a part of the lands and property of the party of the first part called 'Heartfields' in the Townships of Sherman and New Fairfield in the County of Fairfield, State of Connecticut, and distinguished and described as follows: Lot No. ———."

The record shows that except in a few instances the leases contain no further description than the insertion of some number after the final words "Lot No. ———," but without reference to any recorded map or to any map

existing except apparently in the imagination of the Colony's founder and president.

7. Except in the instances mentioned supra in the Farley contract, leases were not recorded; in only two instances were they recorded prior to the $100,000 mortgage and other liens. The practice of the town clerk's office was to accept for recordation any instrument tendered regardless of its obvious defects.

8. The lease by its express terms, clause 8, contained a cancellation clause:

"In order to insure to its many tenants and leaseholders quiet and peaceful enjoyment of their tenancy, and to safeguard and protect its interests and property, the party of the first part hereby expressly reserves to itself the right to cancel and terminate the lease of any of its tenants, or leaseholders, including this indenture, upon thirty days' written notice of its intention so to do."

9. The tenth clause says: "It is further expressly understood and agreed upon by the parties hereto that upon the termination of this indenture for any of the causes hereinafter related, or for any other cause, including death, the lessor shall have the option of acquiring by purchase or otherwise full title, ownership and possession of any and all buildings of whatsoever character and use, then and at such time being and existing upon the land herein leased * * * at 'the fair and reasonable value of such buildings at such time' as may be agreed upon or as may 'be fixed and determined by an arbitration committee.'" (It will be observed that under this clause, death was an event terminating the lease.)

The one thing at once clear about this remarkable instrument is that it must have taken no little ingenuity to concoct a document which by its terms at once meant apparently so much and at the same time actually so little. Viewed in the light reflected in the record—the circumstances under which leases were delivered, the absence or uncertainty of description, the defaults in payment of rent, the seniority of recorded mortgages and other liens, it would seem clear that precarious and tenuous enough were the rights of lessees under the most favorable conditions, and that under the conditions of a creditor's suit in a court of equity, there could hardly arise any serious problem as to the efficacy of the orders of that court in transferring those tenuous rights, if any, from the land to proceeds of sale, especially when, in the course thereof, the lessees were receiving, in addition, indisputably beneficial tenure under new leases from the new owner. There can be no doubt but that whilst Farley rightly desired and insisted upon the cancellation of the old leases, he was equally desirous of retaining, as the nucleus for his development of the property, the lessees as tenants under the new leases prepared by and to be granted by him.

I shall now recite the proceedings taken to confirm the Farley contract, proceedings now attacked as having been ineffective to terminate the old leases and transfer their rights to proceeds of sale. On April 10, 1930, this court issued a rule nisi requiring all persons interested in the Colony and its assets to show cause, if any, on April 22d, why the property should not be sold and the Farley contract approved. The rule was issued on the lengthy petitions of the receivers, wherein they recited the over two years' history of the receivership, the then condition of the estate, the necessity of a sale, the disastrous alternative of rejecting the Farley proposal which they recommended be approved in lieu of any more favorable offer. Attached to their petitions was the Farley contract and its schedules. Pursuant to the rule, at least ten days' notice of the hearing was immediately given by mail to the defendant and all persons claiming an interest in its assets, not only to creditors, lienors, litigants, lessees, and stockholders with acknowledged rights, but also to those of them—but without prejudice—who had been foreclosed of interest by prior orders of this court. The notice refers to the petitions and contract filed herein, with copies available at counsel's office; the notice summarizes the salient features of the proposed contract; and what is of paramount importance, it expressly invites other offers for the property:

"Said contract was made expressly subject to the approval of the Court; and whilst the Receivers and their counsel strongly believe that it is to the best interests of all parties in interest that said contract shall be approved, they desire to point out that the signing thereof has not precluded any party in interest or stranger from submitting at or before the hearing an offer for the whole or a substantial portion of said property."

On the return of the rule to approve the Farley contract and consider any other bids, there were present in court on April 22, 1930, in response to the notice, a large number of parties and counsel. The order of sale later entered discloses that among those present, besides creditors and their attorneys, all of whom vigorously argued for the sale, were a large number of lessees in person, together with an array of counsel acting for them; and among the appearances noted, we find,

300

for example, one attorney representing "at least two-thirds of all the lessees who had built dwellings," and again, counsel for the so-called protective committee of stockholder-lessees, and again, the counsel who had instituted and after a year had recently discontinued the appeal taken from the order of December 28, 1928, fixing February 18, 1929, as the final extension of time for defaulters to make good or be barred. The hearing occupied the entire day. Farley and the receivers were present. No one disputed the adequacy of the sales price: Indeed, it was conceded equal to, if not more favorable than, the appraised value fixed by appraisers in 1928. The only objection to confirmation was from a group of lessees who, as I then remarked, were like persons trapped in a burning building and refused to save their lives and jump into the net spread for them merely because the receivers could not also save their personal effects for them. This group requested a week's continuance on the assertion that there then would be presented an offer for the property more favorable to the lessees than that contained in the Farley contract. After the whole day devoted to an examination of the facts, including an audit, and to argument, it should have been apparent to every one, and was, except to a portion of the lessees, that the alternative to the Farley offer or a better one was the certain disaster of a forced sale.

No one objected to the requested continuance and so, a week later, the matter was further argued for half a day, but with a much smaller number present; and inasmuch as there was submitted not only no better offer but no other offer whatsoever, the court approved the Farley contract and confirmed the sale to him, signing an order to that effect dated April 29, 1930. By the terms of the contract, it lapsed, if not confirmed, by May 1st. The order further provided:

"That any valid liens on any of the property thus sold be and the same hereby are vacated and extinguished with respect to the property sold but said liens attach to the same extent and with the same relative rank and priority to and upon proceeds of same upon receipt thereof by the Receivers; and specifically any and all leases and/or instruments purporting to create a leasehold upon or affecting any of the property sold be and the same hereby are canceled and terminated under the general equity power of the Court; and in addition the Receivers be and they hereby are authorized and directed, in accordance with the provisions of said instruments and without prejudice to the validity thereof and/or the rights if any heretofore created thereby and whether or not said rights have by prior orders of this Court been foreclosed and the owners thereof barred, to give the thirty days' written notice of cancellation specified in such instruments to all persons known to the Receivers to claim or to have claimed such leasehold rights, such notice to be given by mailing a copy of this order in prepaid envelopes addressed to such parties at the address last known to the Receivers."

On the same date this court passed a further order appointing a master to examine and receive proof of claims, including ownership or proof of any and all claims of any sort against the Colony and directing all persons asserting any claim of any nature (unless the receivers concede the claim) to prove same before the master; and a copy of the order was mailed to all persons known to the receivers to have asserted any claim of any sort. (By prior order on notice, creditors' time to file claims or be barred expired on August 20, 1928.)

On or before May 2, 1930, copies in full of both orders were served by mail "upon all stockholders, creditors, mortgagees, other lienors, bondholders, attaching creditors, lessees, litigants or other claimants, all persons known to the Receivers to claim or to have claimed leasehold rights, and all other persons interested in the property and assets of the Mattakeunk Cabin Colony, Inc.," and on or before May 13, 1930, there was served by registered mail "upon all tenants and/or other persons known to the Receivers to claim or to have claimed leasehold rights under any and all leases and/or instruments purporting to create a leasehold upon or affecting any of the property of the defendant" an additional notice that the property had been ordered sold and thirty days' notice of cancellation and termination of lease was being given without prejudice, and that certain classes of lessees, as provided in the sales contract filed in court and at the office of the receivers' solicitors, were entitled to new leases and options to purchase as therein provided.

Thus, it will be observed that extensive notice was given not only to the relatively few persons who might still be said to have some stake in the property or lien thereon, and to all persons who so far as the receivers could tell, had ever asserted any such claim (and regardless of the fact that many of them had been barred under prior court orders for failure to cure defaults during the two years past), but also even to those persons whose names had been carried on the Colony's books at the inception of the receivership, although

they had long ceased to have any interest and in many instances never had had any interest in the Colony or its affairs, much less any lien upon land.

Despite the ample opportunity thus afforded to strangers and to any persons interested in the Colony to submit any bid, written or oral, more favorable than the Farley offer, which was manifestly and generally conceded as adequate and indeed with respect to lessees, liberal, a group of lessees, still discontented or fatuously advised, proceeded immediately to take an appeal from the order of sale. On motion, the Circuit Court of Appeals dismissed the appeal as frivolous. Hereinafter I shall comment on the effect thereof.

It is now objected in behalf of Farley that disregarding the other notices of termination of the leases under the general equity power of the court, the additional aforesaid notice given by registered mail and purporting to terminate the leases pursuant to the express terms thereof was ineffective because it is not warranted by the terms of the lease. It seems to me that if, under the provisions of covenant 8, the lessor reserved the right to terminate a lease in order to protect itself and any other tenant, a fortiori it could exercise that power to protect itself and all the tenants from sheer disaster to all concerned. But the short and decisive answer is this, the question is not how or on what theory the notice was given, but merely whether notice was given, and there can be no doubt that adequate notice was given by various usual methods.

The other objection now made to the April, 1930, sale to Farley was that the ten days' notice by mail of the rule nisi of April 10th was insufficient and that no sufficient foundation was laid for the rule nor for the April 29th order of sale, despite the hearings that preceded it. It is not suggested what alternative or additional notice or procedure would have laid a sufficient foundation except, by inference, four weeks' publication, the alleged necessity of which I shall later discuss. I should say here that the position of the vendee and his executors on the whole question of what procedure is sufficient to transfer lease rights to proceeds of sale is an inconsistent one. They do not dispute the court's inherent power in this kind of a creditor's action to sell property free of claims and transfer them to proceeds of sale, but on the one hand they argue that constructive notice under a statute is sufficient if it be strictly complied with (see post), and, on the other hand, that proof of actual receipt of personal service of notice is a sine qua non. In my view, neither is requisite as an absolute condition precedent. And inasmuch as the same basic contention, though variously expressed, appears in most, if not all, of the objections directed toward the lease question, I may as well state here what seems to me the underlying vice in the argument.

■ A court's power to deal with property rights, especially property in custodia legis, is governed by a single fundamental consideration; has it acted with due process of law? The number of cases defining and interpreting this phrase is legion. Its essential meaning is not open to question. In Blackmer v. U. S., 284 U. S. at page 440, 52 S. Ct. 252, 256, 76 L. Ed. 375, Chief Justice Hughes said:

"The requirement of due process * * * is satisfied by suitable notice and adequate opportunity to appear and to be heard."

What notice is suitable and what opportunity is adequate must depend upon the circumstances of the particular case. And as Judge Cooley says in his standard work on Constitutional Limitations (6th Ed.), p. 424:

"Due process of law in each particular case means such an assertion of the powers of government as the settled maxims of law permit and sanction and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs."

An illuminating case on the question as affecting rights to real estate is that of Ballard v. Hunter, 204 U. S. 241, 27 S. Ct. 261, 51 L. Ed. 461, where the Supreme Court held that due process had not been violated where, under a Louisiana statute, notice of taxes was given nonresidents by publication. Said Justice McKenna, page 262 of 204 U. S., 27 S. Ct. 261, 269:

"It should be kept in mind that the laws of a state come under the prohibition of the 14th Amendment only when they infringe fundamental rights. A law must be framed and judged of in consideration of the practical affairs of man. The law cannot give personal notice of its provisions or proceedings to everyone. It charges everyone with knowledge of its provisions; of its proceedings it must, at times, adopt some form of indirect notice, and indirect notice is usually efficient notice when the proceedings affect real estate. Of what concerns or may concern their real estate men usually keep informed, and on that probability the law may frame its proceedings; indeed, must frame them, and assume the care of property to be universal, if it would give efficiency to many of its exercises. This was pointed out in Huling v. Kaw Valley Railway & Improvement

Company, 130 U. S. 559, 9 S. Ct. 603, 32 L. Ed. 1045, where it was declared to be the 'duty of the owner of real estate, who is a nonresident, to take measures that in some way he shall be represented when his property is called into requisition; and, if he fails to get notice by the ordinary publications which have been usually required in such cases, it is his misfortune, and he must abide the consequences.' It makes no difference, therefore, that plaintiffs in error did not have personal notice of the suit to collect the taxes on their lands or that taxes had been levied, or knowledge of the law under which the taxes had been levied."

■ At any rate, whatever my view as to whether the sale to Farley in April, 1930, constituted due process of law and was therefore effective in transferring from the land to proceeds of sale any existing leasehold rights so that the title must be said to be free from any reasonable doubt of marketability in that respect, there can be no doubt as to the opinion of the Circuit Court of Appeals. I mentioned that a group of lessees took an appeal from the April 29, 1930, order of sale. The receivers thereupon moved to dismiss it as frivolous. That motion, rarely made and more rarely granted, was argued by counsel. The record before the Circuit Court of Appeals included, besides affidavits pro and con, the decree of sale appealed from, the rule nisi of April 10th, with the notice of hearing annexed, the petitions of the receivers on which the rule issued, the annexed Farley contract and schedules including form of lease, the auditor's statement filed at the hearing and showing the condition of the estate as of April 15th. On June 12, 1930, the Circuit Court of Appeals unanimously granted the motion. Its opinion follows:

"Motion to dismiss appeal granted. The appeal is frivolous. See Steele v. Culver, 211 U. S. 26 [29 S. Ct. 9, 53 L. Ed. 74]; Offield v. N. Y., N. H. & H. R. R. Co., 203 U. S. 372, 377 [27 S. Ct. 72, 51 L. Ed. 231]."

An application for a writ of certiorari to the Supreme Court was threatened by the appellants but never taken. It is hard to imagine a more clear and authoritative finding that the sale was valid and binding upon all parties in interest; most certainly upon the lessee class from whose number appellants were recruited, and that the proceedings in this court had been adequate and effective to transfer from the land to proceeds of sale all liens and rights including those of lessees; nor can one imagine a clearer decision that the District Court's order of sale constituted due process of law and was not an abuse of discretion than the circuit court's dismissal of the appeal as frivolous. In any event, that decision is binding upon me and Farley and his executors have honored that decision with silence. In my view, that decision is in itself sufficient to dispose of the present suit so far as is concerned the lease question which Farley himself states was his main, if not sole, objection to title. Yet, inasmuch as he later, in 1933 in answer to this suit, has argued and his executors strenuously contend that the April, 1930, sale was a mere "private" sale and therefore a nullity and that the later "auction" sale of December, 1930, January—February, 1931, was the effective one, if any was, but that it, too, was a nullity because of failure strictly to comply with the statute, I must examine that later proceeding.

The objection made is that although publication of the notice of sale was had once a week during four successive weeks, there had elapsed twenty-four days instead of twenty-eight days between the date of first publication and the date of sale; and it is strenuously contended that therefore the sale was a nullity, confirmation thereof void and insufficient to authorize a conveyance. To this point Farley and his executors have directed their major attack and I shall therefore consider it more extensively than the point, in my view, warrants. But before proceeding with the discussion thereof, I shall again continue the narrative of the material facts during the intervening period. About the time the Circuit Court of Appeals had spoken, in June, 1930, the parties agreed upon the surveyor, Rogers, a man concededly competent, painstaking, and, by reason of long residence very near the property, familiar with it and the questions affecting it and its title, for Rogers, though not a lawyer, was by long experience familiar with title problems. Farley engaged a local Connecticut title company to examine, report on, and insure to him the title and also to issue so-called "plot" insurance policies to the individuals to whom he expected to sell building lots in the course of his subdivision and development of the property. Though the sales contract did not expressly make as the test of marketability of title the willingness of some title company to report or insure the title as marketable, yet both parties contemplated that in accordance with the established custom, particularly in such a subdivision and development operation, the availability of a title policy was generally required.

The record shows that Farley decided in favor of the Connecticut company as against

the New York company because, while their rate of charge was the same for the first insurance on the conveyance to him, the New York charges were higher for plot insurance to subsequent buyers. The Connecticut company was represented by Connecticut counsel who thereupon proceeded to examine the title in collaboration with the work of the surveyor who proceeded to survey the tract ultimately shown to comprise a total of 1,-171.54 acres. Difficulties were encountered in both directions and it was not until October, 1930, when title counsel submitted their first preliminary report which disclosed what in their view was a large number of exceptions to the title. The vast majority were minor ones readily correctable; and as it subsequently transpired, all defects were later removed except, as hereinafter indicated, those waived or whose curing was delayed by Farley himself. In the meantime, the lessees, with a few exceptions, had become reconciled to the sale of the property to Farley; indeed, most of them had begun to realize that that sale with its provisions in their favor for new leases and a preferential option to purchase, was their salvation. No effort was made to evict those of them who continued to occupy cottages during the summer for there continued to operate the same reasons, primarily in the interest of Farley, to keep alive for his development plan, this valuable nucleus of tenants whose occupancy was thus without any legal tenancy, but who nevertheless were entitled to a tenancy from Farley upon his taking title to the property.

It is interesting to note as the record shows that the title counsel in their report make no mention of the necessity for a "public" sale under the Act of Congress of March 3, 1893 (28 USCA §§ 847–849). It was Farley himself who, toward the end of 1930, called attention to this statute and to the case of Cumberland Lumber Co. v. Tunis Lumber Co. (C. C. A.) 171 F. 352. The receivers' solicitors did not consider that case applicable nor the statute mandatory, but they promptly honored Farley's request that, to avoid any question, there be held an auction sale of the property and Farley agreed to bid thereat the same price and terms embraced by his contract and this court's order of sale which had confirmed it. Accordingly, the following proceedings were taken: A rule nisi was issued herein and filed December 30, 1930; as therein provided, notice of sale was published January 2, 9, 16, and 23, 1931; the sale was held January 26, 1931; on February 2, 1931, there was issued a rule nisi to confirm the sale to Farley who had been the only bidder and

had personally bid for the property on the terms of his April, 1930, contract; as provided in the rule, eight days' notice by mail was given to the defendant and to all persons interested in the property and the assets; a hearing was had on the return of that rule and the only objection to confirmation was made by an attorney who stated he had just been retained by Mallett in behalf of two lessees and his sole objection to confirmation was that no notice of the sale had been given other than by publication as provided in the statute. This court therefore confirmed the sale by order dated February 13, 1931.

It is undisputed that these proceedings had been taken under the supervision of the title counsel who at no time doubted, indeed consistently reported that they considered the statute had been complied with. And it is not until Farley is called upon to answer the present suit in August, 1933, two and one-half years later, that he for the first time asserts that the elapsed period of publication of the notice thereof was twenty-four days and that it should have been twenty-eight days, an absolutely fatal defect, according to his contention. I shall now quote the statute and consider in detail the authorities exhaustively cited in the briefs.

Section 847 of the United States Code Annotated provides that:

"All real estate or any interest in land sold under any order or decree of any United States court shall be sold at public sale at the courthouse of the county, parish, or city in which the property, or the greater part thereof, is located, or upon the premises, as the court rendering such order or decree of sale may direct."

Section 849 provides:

"No sale of real estate under any order, judgment, or decree of any United States court shall be had without previous publication of notices of such proposed sale being ordered and had once a week for at least four weeks prior to such sale in at least one newspaper printed, regularly issued and having a general circulation in the county and State where the real estate proposed to be sold is situated, if such there be. If said property shall be situated in more than one county or State, such notice shall be published in such of the counties where said property is situated, as the court may direct. Said notice shall, among other things, describe the real estate to be sold. The court may, in its discretion, direct the publication of the notice of sale herein provided for to be made in such other papers as may seem proper."

There is no dispute that the property was sold at the courthouse in the proper county, that the medium of publication was proper, that the notice of sale properly described the real estate, but it is denied that publication was made in that though there was a publication during each of four successive weeks, twenty-eight days did not elapse between the date of first publication and sale, but only twenty-four.

I must say at once that I have reached the conclusion that, even though we disregard the effect of the Circuit Court of Appeals' decision above mentioned, the question is immaterial, because this statute, under the decided authorities, has been held directory and not mandatory. In any event, I would be bound by the same view which is the law of this Circuit. That court's most recent enunciation is in Revere Copper & Brass, Inc., v. Adriance Machine Works, Inc., et al., 68 F. (2d) 708, decided January 8, 1934, where on an application to set aside the sale, the Circuit Court of Appeals affirmed the District Court's refusal so to do. Judge Manton says at page 709 of 68 F.(2d):

"By the Act of March 3, 1893, c. 225, 27 Stat. 751 (28 U. S. C. §§ 847, 848 [28 USCA §§ 847, 848]), the method of conducting a judicial sale rests in the discretion of the court. Usually an order authorizing some one to conduct the sale is made but the order of November 4, 1932, authorized the receiver to offer the property for sale and to submit any offers to the court, on such notice as he directed. This would seem to contemplate a private sale, but the hearing on November 21 was conducted as a public judicial sale by the court. Bethlehem Steel Co. v. International C. E. Corp. (C. C. A.) 66 F. (2d) 409. Notice was given to the parties interested. The terms and methods of a judicial sale are largely in the discretion of the district judge directing the sale. Pewabic Mining Co. v. Mason, 145 U. S. 349, 12 S. Ct. 887, 36 L. Ed. 732; Luhrig Collieries Co. v. Interstate Coal & Dock Co., 287 F. 711 (C. C. A. 2); In re Haywood Wagon Co., 219 F. 655 (C. C. A. 2)."

Thus, it is obvious that this Circuit considers the test of the difference between a "private" and a "public" sale lies not in the method or extent of the notice of sale, but in the presence or absence of those elements which the true intent and purpose of the statute seeks to assure. It is equally obvious that this Circuit considered the April, 1930, sale to Farley a public and not a private sale. An examination of some of the cases cited in the quotation just made confirms the rule that this Circuit has long regarded the conduct and confirmation of judicial sales as resting in the sound discretion of the District Court and on appeal the sale will not be disturbed if there occurred fair competitive bidding and the property fetched the reasonably highest price obtainable, this, as will hereinafter appear, being the real purpose of the statute and it is therefore generally construed as merely directory. Thus, in Bethlehem Steel Co. v. International C. E. Corp. (1933), cited above, this Circuit (with modification as to a point not here present), affirmed without even considering the statute, the District Court's order confirming a judicial sale under circumstances in many material respects essentially similar to the April, 1930, sale in the case at bar. In the Bethlehem Case there is nothing to indicate that there occurred any publication, rather the contrary, to wit, hearings on a show cause order noticed by circularizing the creditors, yet the opinion of the Circuit Court of Appeals states at page 411 of 66 F.(2d):

"Thus there was a public sale with competitive bidding and the assets were sold to the highest bidder."

And further:

"It is said that the sale is invalid because an upset price was not fixed. If one were fixed, it would be included in the order of sale; otherwise prospective purchasers would not be informed as to the minimum bid requirements. But no one urged this before the court below as an objection. Moreover, the fixing of an upset price was discretionary. Palmer v. Bankers' Trust Co., 12 F.(2d) 747 (C. C. A. 8); Provident Life & Trust Co. v. Camden & T. Ry. Co., 177 F. 854 (C. C. A. 1). We find no abuse of discretion in this absence of an upset price. In Guaranty Trust Co. v. Chicago, M. & St. P. Ry. Co. (D. C.) 15 F.(2d) 434, and in Equitable Trust Co. v. Western Pacific Ry. Co. (D. C.) 233 F. 335, reference is made to fixing an upset price as discretionary, and the court clearly recognized such discretion. We find nothing in the procedure leading up to or in the conduct of this sale which leads to the conclusion that the bids were not made in good faith and in competition thus obtaining the highest possible price."

Curiously enough, in our case the executors in their brief make a minor additional attack on the ground that in the December 30, 1930, order of sale by this court, an upset price was fixed, namely, the price and terms embraced in the April, 1930, contract and confirmatory order. In other words, the executors contend that the upset price had a tend-

ency to chill the bidding and thus reduce competition although obviously its very purpose was to assure obtaining at least the upset price and, if possible, a better one, the very object of the statute. See, also, Robertson v. Howard, 229 U. S. 254, 261, 264, 33 S. Ct. 854, 57 L. Ed. 1174.

In Nevada Nickel Syndicate v. National Nickel Co. (C. C.) 103 F. 391, 399, it appears that notice of a sale was published for twenty days instead of twenty-eight, and, in addition, there was failure in other respects to strictly conform either to the federal or the state statute, and the court held that a failure to observe the strict statutory provisions did not render the sale void, but only voidable, and that the defect is cured by confirmation after due notice to the defendant and without objection from him. On page 399 of 103 F., Judge Hawley said:

"The provision of the statute of the United States requiring that in all cases four weeks' notice should be given of the time of sale was intended for the benefit and protection of the judgment debtor, and created a privilege and right which the judgment debtor in any case may insist upon or waive."

And on page 394 of 103 F.:

"A decree which the court had jurisdiction to render, not appealed from, is final and binding, in so far as it affects the parties thereto, whether erroneous or not. Whenever a sale of property is decreed by a court of equity as the result of a litigation in a suit of which the court had jurisdiction, it is the policy of the law that it shall not be set aside for trifling causes, or for any matters which the complaining party might have attended to and had corrected; and whenever such a sale is attacked by a party to the suit the court will closely scrutinize all previous actions of the parties during the litigation which may throw light upon or tend to explain their actions or conduct with reference to the sale. The law does not tolerate that a party who might have taken an objection to the time, terms, and manner of the sale, as provided for in the decree, should designedly wait until the property has been sold to the other party, and then attempt to set aside the sale on any of such grounds."

And on page 396 of 103 F.:

"The sale is not absolute until confirmed. The order of confirmation gives the judicial sanction of the court, and when made it relates back to the time of sale, and cures all defects and irregularities, except those founded in want of jurisdiction or in fraud. The court has power to confirm the sale, although the terms of the decree may not have been strictly followed. The matter of confirmation rests peculiarly upon the sound discretion of the court, to be judicially exercised in view of all the surrounding facts and circumstances, and in the interest of fairness, justice, and the legal rights of the respective parties."

The same facts were again considered in the same case in (C. C.) 106 F. 110, and Judge Hawley adhered to his previous ruling and refused to set aside the sale. The same case appears a third time in (C. C. A.) 112 F. 44, where the court again adhered to its prior views and sustained the title to the purchaser at the judicial sale, though admittedly it did not conform to the provisions of the federal statute. Certiorari was denied, 184 U. S. 700, 22 S. Ct. 939, 46 L. Ed. 765. I find the Nevada Nickel Case is cited with approval by Judge Rogers, speaking for the Circuit Court of Appeals, in Re Burr Mfg. & Supply Co., 217 F. 16, where similar questions were presented and decided (page 20 of 217 F.) adversely to the executors in the case at bar.

Judge Rogers also cites with approval Morrison v. Burnette et al., 154 F. 617 (appeal dismissed 212 U. S. 291, 29 S. Ct. 394, 53 L. Ed. 517), where the Circuit Court of Appeals for the 8th Circuit speaks in the same vein. The Nevada Nickel Case is also cited with approval by the Circuit Court of Appeals for the 9th Circuit in Re Jacobson, 4 F. (2d) 211, and the court held that a sale contrary to the provisions of the statute is not void and that the court should consider whether the party seeking to attack the sale is estopped by his conduct. See, also, Arapian v. Rice (C. C. A.) 296 F. 891.

In Godchaux v. Morris et al., 121 F. 482, 485, the Circuit Court of Appeals for the 5th Circuit decided that where the sale was held at a place other than those specified in the statute, the sale is not void nor will confirmation thereof be refused; and that the decree will be binding unless the error be reversed on appeal. The court expressly adopts the special master's conclusions of law, inter alia:

"The act does not declare that a failure to comply with these directions shall render the sale null, nor is any penalty denounced for their violation."

In Lansburgh et al. v. McCormick et al., 224 F. 874, the Fourth Circuit Court of Appeals similarly decided that as to a sale held at a place other than those specified in the statute, the defect is not jurisdictional and does not render the sale void and that the doctrine of estoppel operates; and the court cited with approval the Godchaux Case, supra, and distinguished its own decision made

six years earlier in Cumberland Lumber Co. v. Tunis Lumber Co. (C. C. A.) 171 F. 352, the case on which Farley's executors place their main reliance. It is true that in the Cumberland Case, the court held the sale void and granted the prompt motion of the purchaser to be relieved of his sealed bid and it is true that certiorari was denied (215 U. S. 603, 30 S. Ct. 403, 54 L. Ed. 345), but it seems clear that counsel have mistaken the form for the substance and have overlooked the ground on which the Cumberland decision stands and which the very court that decided it, recognized in its later decision in the Lansburgh Case. No useful purpose is to be served by a detailed recital of the facts in the Cumberland Case, nor by belaboring the language of the opinion which is occasionally broader than necessary to support the finding and to that extent misleading. Suffice it to say that the court considered the sale was a private, not a public sale, and incidentally the purchaser had moved promptly to be relieved. At any rate, the same court had no difficulty six years later in distinguishing its Cumberland decision, for in the Lansburgh Case it said at page 876 of 224 F.:

"This sale is attacked as a nullity because under the order of the court the sale was made in the city of Charleston, and not, as required by the federal statute, on the premises or at the courthouse door of McDowell county, in which the land lies. The court having jurisdiction to order the sale, the mistake of directing that it be made at a place different from that required by the statute did not make the sale void for want of jurisdiction, but was an error to be corrected by appeal or by direct application to the trial court. Godchaux v. Morris, 121 F. 482, 57 C. C. A. 434. This court, it is true, held in Cumberland Lumber Co. v. Tunis Lumber Co., 171 F. 352, 96 C. C. A. 244, that a purchaser who had purchased at a private sale, ordered by the court, contrary to the statute requiring sales to be made at auction, should be relieved from his purchase even after confirmation, upon his own application to the court wherein the cause was pending."

Lansburgh v. McCormick, supra, is cited with approval in Walker et al. v. Stuart (D. C.) 261 F. 427, where there is also cited Wilson v. Northwestern Mutual Life Ins. Co. (C. C. A.) 65 F. 38, which held that exception to the confirmation of a sale on the ground that there had been a failure completely to comply with the publication provisions of the federal statute, is available only to a person entitled to share in the proceeds of sale and therefore not to the purchaser thereat, the same principle as enunciated in the Nevada Nickel Case, supra.

Counsel to Farley's executors cite in their brief In re Brittania Mining Co. (D. C.) 197 F. 459, which involved a bankruptcy trustee's sale in Wisconsin of assets which included real estate situated in Montana. It is true the District Court set aside the sale, but the decision, so far as it rests on principle, recognizes the same real purpose of the statute as do the list of authorities cited supra, and so far as the decision rests on the precedent of the Cumberland Case of 1919, it must fall, for that case was, in 1915, distinguished by the same Circuit Court of Appeals in the Lansburgh Case, not decided until three years after the Brittania Case. From a reading and consideration of Judge Sanborn's opinion in the Brittania Case, from the bottom of page 461 and on page 462 of 197 F., it will be observed that the District Judge, while he recognized the true intent of the statute and admitted that several of the circuit courts had therefore considered it merely directory, felt bound by the apparently contrary holding of his own Circuit in the Cumberland Case because he did not recognize the ground of that decision as later recognized by his Circuit in the Lansburgh Case, namely, the sale was a private, not a public sale.

It would seem clear that the Circuit Courts of Appeal, including that of the Second Circuit, are in agreement and that the view is sustained by the Supreme Court (if only in having denied certiorari in the Nevada Nickel Case, supra; see, also, Robertson v. Howard, supra), and that the general conclusions reached by the various cases are as follows: That the statute is merely directory and not mandatory; that failure to comply therewith is a mere irregularity which does not make the sale void; that the objection is to be taken promptly, preferably before confirmation, at any rate by appeal; that it is available only to the defendant or other persons interested in the proceeds of sale and they must not be guilty of laches or be otherwise estopped; and that in any event, it is most certainly not available to the purchaser where, as in the present case, the record shows and it cannot be, indeed is not, disputed that the sale was a public and not a private sale, and that there was ample opportunity for fair competition and the property fetched an adequate price, indeed, was sold at the highest terms reasonably obtainable. I have therefore concluded that there is no merit to the suggestion that the four days' deficiency in publication was such a defect as to relieve the purchaser of his bargain, particularly

after two and a half years' silence, despite full knowledge of the facts at all times. And I have already stated that by the tests enunciated in the cases I have cited in connection with the statute, I have no doubt that the prior sale held in April, 1930, was likewise a public, as distinguished from a private, sale and must have been so considered by the Circuit Court of Appeals when it dismissed as frivolous the appeal taken by a group of leaseholders from the order confirming that sale.

It would hardly seem necessary to consider two other objections made by Farley and directed to the lease question and attacking respectively the two proceedings had herein even prior to April, 1930, viz., the proceedings of March, 1928, and December, 1928. It is again contended that they were inadequate in that no proper foundation was laid for the orders passed and that there is insufficient evidence of receipt of notice of hearings. Those orders required stockholders and lessees to cure their defaults or be barred; their time was extended to February 18, 1929, and some of them took an appeal which, however, they discontinued a year later. The record shows that nevertheless all parties in interest, not only creditors and lienors, but stockholders and lessees, whether or not in default, continued to be notified on numerous occasions by publication and by mail of all action affecting them; indeed, as will hereinafter appear, all lessees were notified as late as September, 1931. I conclude that the various proceedings were customary and adequate and constituted due process of law; and in view of the extensive discussion of the more important and decisive sales had in April, 1930, and February, 1931, I shall forbear extensive comment upon objections to minor proceedings antedating them. Indeed, it is sufficient to refer to Luhrig Collieries Co. et al. v. Interstate Coal & Dock Co., 287 F. 711, where the Circuit Court of Appeals of this Circuit held that where a purchaser's interest at a sale in a creditor's suit began with his bid, he had no right to complain about nor appeal from any orders made before his rights accrued.

I might add this word as to the suggestion made by the respondents with respect to these prior proceedings, namely, that recourse should have been had to another statute, viz., section 57 of the Judicial Code (28 USCA § 118), which provides for personal service if practicable, and, if not, for publication not less than once a week for six successive weeks. The record shows that this procedure was considered by various interested counsel including the title attorneys, and all agreed the statute was inapplicable and applied only to a suit between private parties of diverse citizenship and affecting property claimed by one of them; and that in such a suit, the statute authorizes a departure from the general rule of venue. I concur. See Consolidated Interstate Callahan Mining Co. v. Callahan Mining Co. et al. (D. C.) 228 F. 528; O'Neil, Ins. Com'r, v. Birdseye et al. (D. C.) 244 F. 254; Kansas G. & E. Co. v. Wichita Natural Gas Co. (C. C. A.) 266 F. 614; Doherty v. McDowell et al. (D. C.) 276 F. 728; Vidal v. South American Securities Co. et al., 276 F. 855 (C. C. A. Second Circuit).

In order to discuss the final objection directed to the question of leases, I shall narrate the material facts in the interval from the confirmation of the auction in February, 1931, to September—October of that year, when there occurred the proceeding to which this objection is taken. Work continued on the survey and the examination of title by the title attorneys, so that in May, 1931, the latter reported to Farley that as a result of the extensive work done with the very competent assistance of Rogers, the surveyor, and which had involved the procuring of scores of documents, the title was now in a position which they considered close to marketable under the sales contract. There remained a few minor questions which would be cleared up as soon as Farley indicated his preference as to alternative choices of minor boundary lines, exchanges of minor parcels, etc. Thus the title attorneys wrote Farley, "In view of the present condition of the title, we believe you are warranted in making a trip to New Fairfield to look over this property and make your decision as to any exchange you may or may not desire."

Farley, however, despite all the proceedings already had, including the last auction sale, claimed to be still concerned as to whether the lessees' rights had been effectively transferred to proceeds of sale. On the other hand, as the record shows, the receivers, during the spring of 1931, continued to press Farley to close title.

During this impasse, the obviously fatuous suggestion was made—whether with the connivance of Farley is uncertain from the record—that the question might perhaps be best settled by the receivers moving out of this federal court and commencing an action against all known lessees in the state courts of Connecticut under a state statute to remove clouds on title. The receivers naturally protested against the time and expense of further publication and the fatuity of moving out

of this court. The inertia nevertheless continuing, the receivers' counsel arranged in July, 1931, a conference of Farley and the Connecticut title attorneys with the New York Title & Mortgage Company with the view, if feasible, of having the latter reinsure the Connecticut company. Farley did not attend. The record is extensive and it seems clear that after the Connecticut attorneys "told the worst" to senior title officers of the New York Title & Mortgage Company, the latter ridiculed the alleged problem as nonexistent and agreed to reinsure or to insure Farley direct. The result was that the Connecticut company at first accepted this offer, only to repudiate the arrangement shortly thereafter; again, it is not established whether this was with Farley's connivance, or due to business motives, the local company preferring not to encourage any "poaching" on its local "preserves" by the New York company (which was authorized to insure titles in Connecticut). At any rate, Farley then, under pressure from the receivers, indicated that he would accept title if they would initiate a further proceeding to determine which lessees claimed the right to receive new leases from him pursuant to the sales contract and which lessees, if any, would refuse them, and insist on rights under the old leases despite their termination under the various orders and decrees of this court. The receivers protested that the matter of granting new leases was Farley's obligation, not that of the receivers, and that under the express and implied terms of the sales contract the performance of the obligation was not a condition precedent, but subsequent to or at most concurrent with the closing of title, the view shared also by the title company attorneys. Nevertheless, at Farley's urgent request, the receivers agreed to initiate such a proceeding provided Farley would pay one-half the carrying charges of the property until the autumn when it was contemplated the proceeding would be completed. It seems to me Farley was temporizing in the hope economic conditions would improve. On elaborate petitions verified August 4, 1931, and attached to which was the form of new lease prepared by Farley, there was issued the lengthy detailed order of September 2, 1931, which I forbear quoting. Copies were served by mail, without prejudice, on all parties known ever to have made claim as lessees and whether or not already barred, and a copy was affixed to each of the thirty-one cottages on the property. The order directed, inter alia, that lessees, under penalty of being further barred, file by September 28, 1931, affidavits in which they must state whether they claimed new leases from Farley; if so, the address at which they were to be tendered (at or immediately after Farley took title to the property); and they were required to state the details of any damage claimed by them as a result of the termination of the old lease and the acceptance of the new. Similarly, if they did not desire a new lease; and in that case and if they continued to occupy a cottage, they must agree to vacate on notice or they would be evicted by the marshal. The order further provided that Farley must by October 13, 1931, file objections, if any, to the granting of such new leases to any of said persons. The order expressly provided that further action might be taken, if necessary, either by Farley or the receivers or jointly. In response to the order, thirty-four persons filed affidavits; and not a single affiant declined to accept the new leases, for by this time lessees clearly saw that their salvation lay in the sale of the property to Farley. To some of these affidavits Farley filed objections, all of which fall into two categories; in some cases he objected merely that the affidavit in form did not conform to the requirements of the order but agreed to waive his objection if a corrected affidavit were filed, and the record shows that was later done; in the other cases, he objected because the present dwelling was in his view unsightly, but he nevertheless agreed to grant a new lease provided the lessee would cure the unsightliness within six months after obtaining the lease. The object of this proceeding was thus accomplished by the end of October. Incidentally, the whole proceeding had been supervised by Farley's title company attorneys. Nevertheless, Farley still insisted that the lease question was not yet settled; and I am convinced from the record that this contention was advanced solely in order to delay the closing of title or find escape therefrom. At any rate, the impasse continuing, the receivers, with the approval of this court, on November 11, 1931, themselves applied directly to the New York Title & Mortgage Company to examine and report on the title and to insure it to them or to Farley, if found marketable under the sales contract. That title company immediately engaged as its local examining counsel the same attorneys who had been acting for the Connecticut company; and as will hereinafter appear, they in their report to their new employer certified that in their opinion the title under the laws of Connecticut was marketable provided the old lease question was not a cloud and as to that, they stated they expressed no opinion.

It is significant that as soon as Farley learned the receivers had engaged the New York Title Company, he immediately wrote

them on November 16th, complaining of that step; he said that if this was an effort to force him to accept a defective title, he would have to quarrel with the receivers and he suggested that they continue to co-operate with him as they had been doing for so long. The latter replied, assuring him of co-operation, provided he would indicate that he was prepared in good faith to carry out his bargain and accept title with reasonable promptness. In reply to which Farley suddenly on November 25, 1931, wrote his notice of attempted rescission which I have concluded constituted an anticipatory breach. On January 16, 1932, the New York Title & Mortgage Company issued its title report certifying that as of August 15, 1931, the title was marketable in accordance with the sales contract and agreed so to insure it and likewise to guarantee Rogers' survey. It thus appears that the title company did not consider the September, 1931, proceeding at all necessary and that leasehold rights had already been effectively transferred to proceeds of sale by the numerous proceedings theretofore had herein, and with this conclusion I am in accord.

I shall now deal with a further objection made by Farley directed toward the lease question. This is contained in the Flanagan affidavit filed in the present suit in August, 1933. The substance of it is that when the affiant visited the property on August 26, 1933, a year and three-quarters after the Farley breach, he found some of the dwellings occupied and that seven of the occupants, whom he names, asserted to him that their occupancy was adverse to the receivers and the world. Of course, adverse occupancy, if it exists, is a grave defect in title, but the evidence in the record is overwhelming that there was no adverse occupancy on August 15, 1931, as of which date the surveyor Rogers certified to that effect and the title company held the title marketable, nor is there any evidence of adverse possession, but the contrary, as of November 25, 1931, the date of Farley's anticipatory breach, and the evidence is equally clear that there was no adverse possession on August 26, 1933, the date as of which Flanagan states the contrary. The reply affidavits show that of the seven named persons who Flanagan claims were in adverse possession, one was a caretaker who had stated in writing that his occupancy was solely that of caretaker with the written knowledge and consent of the receivers and of Farley, and that he would vacate on request; and of the other six their affidavits filed in this court in connection with the September, 1931, proceedings show that so far from claiming adverse possession, they desired new leases from Farley. And, finally, at least one of these persons, after the date of the Flanagan affidavit, inquired by letter whether and when he could obtain a new lease or deed. I conclude that neither at the material dates nor thereafter did there exist adverse possession.

Before proceeding to discuss the objections unrelated to the lease question, I should add this final word as to that question. In my view, and as I think sustained by the Circuit Court of Appeals, no "reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions" (Todd v. Union Dime Savings Institution, supra) have entertained any doubt as to the marketability of the title because of claims which might possibly, though not probably, be made by lessees beyond those already determined and which it was admittedly in the purchaser's interest to recognize and which he had expressly agreed to recognize by granting them new leases. Aside from the ex post facto second-hand statement of Flanagan which I cannot credit and which is refuted, there is no evidence of lessees having asserted or being likely to assert unwarranted claims and it is undisputed that creditors, a class with real and serious rights, approved, without exception, the sale to Farley. On the whole, it seems to me the original respondent and his successors, the present ones, have skillfully sought to make a mountain out of what was really a molehill and that I have, by this extensive discussion of the lease question, given en to it greater dignity than in fact and law it deserves.

I shall now discuss the objections unrelated to that question. For convenience, I should first state that the New York Title Company report of January 16, 1932, divided the property into three parcels: Parcel I, constituting all but two small exterior tracts comprised 1,159.84 acres, as to which the title was reported marketable; parcel II, the so-called Pine Ledge lot comprising "ten acres more or less," actually 10.40 acres, was reported marketable upon the settlement of its exterior boundary line theretofore delayed by Farley's impediment but subsequently settled, as will hereinafter appear; parcel III, the so-called Woodard tract, also exterior, comprising "one acre more or less," actually 1.30 acres, title defective because of outstanding old claims in certain heirs or creditors.

In this suit, Farley urged, as an objection which his executors have really abandoned, viz., that he was relieved of his contract because of a defect in the title of this trivial Woodard lot, on which was located a house valued by Farley at $1,000. The record shows that there was admittedly a defect which would cost $250 to remove, but that on July 29, 1931, almost four months before his anticipatory breach, Farley wrote confirming his agreement with the receivers that he would waive this defect in consideration of a price reduction of $200. In other words, as pointed out in one of Rogers' affidavits, Farley, instead of paying $136.66 per acre for this acre lot, with a $1,000 house on it, was being paid to accept it. In any event, there is no title question involved, the vendee having expressly contracted, for a consideration, to accept the lot and clear the title himself if he saw fit. But the assertion of this alleged objection is significant in considering whether we are dealing with a vendee who in good faith entertained any reasonable doubt as to the marketability of the whole title and whether he was a buyer "eager and willing to perform his contract."

█ The next objection relates to the other small exterior parcel, Pine Ledge, as to which it is contended that the exterior boundary line was in dispute; that the lot was an essential part of the entire premises and that there had not been recorded in one of the two towns in which this parcel lay, the deed in favor of the Cabin Colony. These objections are equally untenable. The record shows said deed had been recorded in the second township in Book 11, page 557, on April 29, 1931, almost seven months before Farley's breach. The evidence is overwhelming that neither this exterior ten-acre parcel nor the smaller portion thereof involving the boundary line was or could be considered by any stretch of the imagination an essential part of the total property aggregating 1,171.84 acres. I place great credence in the affidavits of Rogers who was the surveyor and most familiar with the property and who had no motive to favor either buyer or seller. He states and attaches to his affidavits corroborative letters from Farley himself showing that Farley for some time confused the location of Pine Ledge with Wanser Mountain and that Farley for a long time prevented the accurate survey of the Pine Ledge boundary line by his protracted, but ultimately abandoned negotiations for the purchase of the contiguous property from the power company, the owner. But for that, states Rogers, and he is supported by the evidence of others, the disputed boundary line would have been determined before Far-

ley's anticipatory breach; and at any rate, it was determined, and in accordance with Farley's own preference, by an agreement made with the power company reasonably promptly thereafter. There is in the record a photostatic copy of the recorded map signed by the power company, dated March 5, 1932, which reflects the settlement of the theretofore disputed boundary line. Now, it is obvious that even if we disregard the doctrines of substantial performance, and the maxim de minimis lex non curat, and the rules enunciated in the various cases already cited, Farley cannot complain of mere delay in the settlement of part of the boundary line of this minor exterior tract when he himself was the cause of that delay. And it is absurd to suggest that he was relieved of his entire bargain.

█ We find Farley raising as another objection in 1933, but not now seriously urged by his executors, that title was defective because of the so-called Pearce spring right. That refers to a questionable right under an old deed to draw water from a spring which, however, is located, as the record and map clearly show, not on the property contracted to be sold to Farley, but in the main highway, indeed, between the traveled portion thereof and a stone wall property line. (See the surveyor's guaranteed map.) Sellers do not and cannot sell a state highway main trunk line; title companies do not insure a buyer's rights therein, and it is fantastic to suggest Farley was relieved of his bargain to purchase 1,171 acres because of a possible spring right in a state highway not contracted to be sold to him.

█ Yet another objection advanced but not seriously urged is that the receivers, in derogation of the sales contract, thereafter conveyed without Farley's consent, 8.40 acres to the state of Connecticut for the said state highway, and that Farley should have been consulted as to the adequacy of the $500 paid therefor by the state to the receivers. The record discloses that about two years before Farley signed the sales contract of April 9, 1930, the state of Connecticut had commenced condemnation proceedings against the Colony for these 8 acres for highway purposes; and the receivers then recently appointed, had, with the consent of this court, agreed to accept $500 for a deed, and the suit had been discontinued. The record further shows that when Farley signed his contract, the highway had been entirely completed; there it was, and Farley necessarily had to travel over it to see the property. Though formal approval of the receivers' deed to the state had not

been entered until June 9, 1930, about a month after the order confirming the Farley contract, in equity, the title to the highway had long since been vested in the state and the state had open, notorious possession. It was fait accompli before Farley acquired any rights therein; and he may not now be heard to complain. Luhrig Collieries Co. v. Interstate Coal & Dock Co., supra. Even if he had any right to be consulted, there can be no question on the evidence herein that the price was adequate and that the highway greatly enhanced the value of the property to Farley. That he should seek to avoid his sales contract on this ground is chimeric.

 The last equally tenuous objection and one likewise now practically abandoned by his executors is that the title was defective because there is on record a $10,000 attachment in favor of a bank and another attachment for $220.67 which Farley, it is contended, had the right to have satisfied of record before being obligated to accept and close title. Suffice it to say that aside from the established custom and practice of satisfying such liens at the time of the closing of title, the sales contract clearly contemplated that such items were to be disposed of out of the proceeds of sale at the time of closing by deposit of sufficient funds with the buyer or a title company. At any rate, at the very hearing attended by Farley in April, 1930, at which there was considered the approval or disapproval on his proposed contract, and any other bids, the receivers reported that they had reached a compromise settlement of said $10,000 attachment, the bank having agreed to accept $2,500 therefor; and an order was entered in which it is expressly provided that said sum, if not otherwise paid, shall be paid out of the purchase price of the property upon its sale to Farley. Until this suit commenced, Farley offered no objection to such method of discharge of such items; indeed, he later suggested that perhaps the smaller item could be similarly compromised and the larger one further compromised.

I have now disposed of all of the specific objections made in Farley's behalf to the marketability of the title and whether they were raised by Farley at or before the date of his anticipatory breach or only years thereafter in the course of this suit. I am not, however, misled into entertaining a reasonable doubt of marketability merely because an astute buyer and able counsel, after the breach and in an effort to justify it, seek to inject various objections having no reasonable basis and by the mere number of alleged objections, seek to create an impression not warranted by the facts either at the material date of the breach or later. In considering them and whether they raised any reasonable doubt either in the mind of the vendee or would be likely to do so in the mind of any reasonable vendee, I have also considered certain general factors which I think are pertinent to this kind of a suit.

 Courts are not so far divorced from the affairs of the market place whose questions they are daily called upon to decide as to be unmindful of the existence of economic forces and their effect upon sales contracts and the conduct of buyer and seller. Even without the evidence in the record, I may take judicial notice of economic changes which have occurred during the last several years. In Atchison, Topeka & Santa Fe Railway Company et al. v. U. S. et al., 284 U. S. 248, at page 260, 52 S. Ct. 146, 149, 76 L. Ed. 273, the Supreme Court held that it may take judicial notice of a general economic depression, the opinion saying:

"There can be no question as to the change in conditions upon which the new hearing was asked. Of that change we may take judicial notice. It is the outstanding contemporary fact, dominating thought and action throughout the country. As the Interstate Commerce Commission said in its recent report to the Congress, 'a depression such as the country is now passing through is a new experience to the present generation.'"

I can without the aid of the record take judicial notice of the fact that when Farley signed his contract in April, 1930, there had already commenced an upturn from the debacle of the autumn of 1929 and that this improvement continued for a time and then remained at a plateau more or less until about the middle or fall of 1931, when there were indications of a downward trend and it was discovered that prosperity, which was thought to be around the corner, was actually a mirage; and that economic conditions became worse in the succeeding years. Unquestionably, Farley's conduct herein was influenced by these economic phases and their effect upon his fortune which was largely centered in real estate, a kind of property peculiarly depressed, as every one knows. I think that up to the spring of 1931 Farley was acting in good faith in this matter, though he preferred not to take title promptly and rather preferred to delay until we reached the corner where it was said prosperity lurked. But, thereafter, I think it is clear Farley was actively delaying the completion of his bargain; and by the autumn of 1931 was endeavoring carefully to prepare an escape therefrom, if possible. On no other theory can there be ex-

plained his resentment of the receivers' action, approved by this court, in engaging the New York Title Company in November of that year. Surely a buyer "willing and anxious to perform his contract" would have welcomed a favorable report by such a title company and would have welcomed its title policy if it reported the title marketable, and, on the other hand, such a buyer who nevertheless honestly doubted the title, would equally have welcomed and surely had nothing to fear if the report certified the title as unmarketable. I do not think that Farley's resentment was due to any sudden pique or volteface; I think his suggestion of continued co-operation was intended to persuade the receivers to abandon the title examination and insurance and to renew further dilatory and protracted discussions; and when they proffered continued co-operation but nevertheless insisted upon a prompt closing of title, Farley, anticipating the favorable report of the title's marketability, gave notice with assumed pique and with various self-serving declarations that he considered himself relieved of his bargain and would not accept title.

I do not think I am unfair to Farley in ascribing to him at that time these motives, for the subsequent history of the matter certainly lends color to the conclusion that he did not reject title because of any honest reasonable doubt as to its marketability. I shall briefly recite that further history as it appears in the record.

When Farley received a copy of the survey map, title report, and proffer of insurance, he still pretended to be concerned in regard to the lease question. And he claimed that the title policy did not clearly insure him against that risk, nor did it guarantee marketability. Thereupon he was supplied with a letter from the title company in which it expressly and very clearly stated that its standard form of policy, as per copy thereof attached, expressly insured marketability, and that it contained and would, when issued, contain no exception with regard to the leases as appears in Burdett's affidavits and attached exhibits. Farley still claimed this was not sufficiently clear, although he admitted that on other properties he held the same standard form policy from that company, in one case a policy for $600,000. The title company suggested that he submit his own form of such assurance, but although at a conference which he and the receivers' counsel had with this court, he promised to confer with the title company or have his counsel do so, that promise was never fulfilled. The extensive evidence on these points is undisputed by Farley or his executors.

There then followed for almost fifteen months protracted negotiations between Farley and the receivers in the hope that this litigation might be avoided. Farley indicated that he would be inclined to buy the property provided the purchase price was drastically reduced and likewise the cash requirements. As appears in the correspondence and passim in the record, Farley admitted he was short of cash and was unable to raise cash by mortgaging the various properties he owned. It was suggested that the purchase price be reduced from $160,000 to around $100,000 to $110,000, and that the cash requirement from $90,000 to about forty and then to ten or twenty. The major creditors, rather than embark upon a protracted litigation, were willing that these concessions be made and be charged mainly, if necessary entirely, against their distributive shares in the receivership estate. However, it proved ultimately impossible to obtain from Farley an unequivocal commitment to take the property even at these drastic concessions which he had indicated were acceptable. It seems to me obvious from the correspondence alone that he was negotiating merely as a time saving device and to avoid suit, if economic conditions did not improve markedly.

What broke the camel's back and precipitated this suit was the final offer of Farley. He engaged counsel and by their letter of March 28, 1933, he proposed that the receivers convey the property to a new corporation organized for the purpose, with a capital stock of $100,000, issue to him for his $10,000 deposit 10 per cent. of that stock, and the balance to creditors in discharge of their debts and for administration expenses; and that he then be engaged by the new company to manage the property and sell it off in building lots. This he suggested was the best way of ultimately paying creditors. This was such an obviously unexpected repudiation by Farley of the spirit and purpose of the negotiations and of his contract to buy this land, that in response to the indignant clamor of creditors this suit was commenced. What, however, is to me especially significant about this final offer of Farley's, is the total absence of any anxiety as to the condition of the title. Obviously, the same conditions would operate during his management and resale of the property, as would control if he became the sole purchaser. As he was content to have a $10,000 investment in the property and entertained no doubt about having issued to purchasers of building lots policies insuring their title, admittedly a sine qua non, he must be presumed to have entertained no reasonable doubt as to the marketability of ti-

tle and of its insurability by a title company. Under all the circumstances of this case, I do not think it is an answer to suggest that he was willing to risk $10,000 but not $160,000. It seems to me the plain fact is merely this: Farley had long since realized that under the changed economic conditions, he had made a bad bargain; he lacked the cash to complete it, and he struggled to escape his obligation. He could not complain of any lack of patience or unwillingness on the part of the receivers and creditors to compromise, subject to the court's approval; and this court had informally indicated its willingness to approve any reasonable compromise to avoid protracted litigation.

■■■ I shall now comment upon one further point vigorously urged by the receivers, namely, the weight to be given to a proffer of title insurance in determining any question of marketability. In the record are about a score of affidavits by attorneys and laymen, all more or less experienced in real estate transactions and their legal and business aspects, some of the affiants being more or less interested in this transaction as creditor or lessee or of counsel, others utterly disinterested, and many of the affiants being specialists in real estate law and practice and some of them peculiarly familiar with the title and property involved here. The most conservative view, that expressed by a disinterested Connecticut practitioner, recognized as a specialist in the law of real property, is this, that on the undisputed facts, namely, that the title was searched by Connecticut attorneys who reported to the New York Title Company, and that the latter's legal staff, after considering the report and the various documents on which it was based, issued its own report that title was marketable and agreed to insure its marketability in accordance with the sales contract, then that would be a good test of marketability. The views of the other practitioners, including experts, are much stronger and to the effect that the proffer of such title policy insuring marketability is almost decisive and at any rate is deemed conclusive as a practical matter, that is, that in the market place and among counsel and according to the custom and usage, it is almost unheard of for a buyer to reject as unmarketable, a title insurable as marketable. Now, it is elementary and requires no citation of authority to support it, that the court cannot be deprived of its judicial function to determine marketability or a reasonable doubt thereof, that is, in the absence of the clearest convention between the parties that a proffer of such title insurance shall be binding and conclusive.

But I have no doubt that the court, whether or not it may take judicial notice of the general custom and practice with respect to title insurance in real estate transactions, may consider the undisputed evidence before it of the custom and of the weight given in the market place to title insurance. The receivers' counsel in their briefs state they have been unable to find a case on the question of the weight, if any, to be given in law to a proffer of insurance, and they suggest the difficulty is due to the absence of litigation for the very reason that insurance is so generally regarded by buyer and seller as conclusive. The nearest case cited by counsel is Foehrenbach v. German-American Title & Trust Co., 217 Pa. 331, 66 A. 561, 563, 12 L. R. A. (N. S.) 465, 118 Am. St. Rep. 916, where it is said:

"Title insurance is not mere guess work, nor is it a wager. It is based upon careful examination of the muniments of title, and the exercise of judgment by skilled conveyancers.

"The quality of a title is a matter of opinion, as to which even men learned in the law of real estate may differ. A policy of title insurance means the opinion of the company which issues it, as to the validity of the title, backed by an agreement to make that opinion good, in case it should prove to be mistaken, and loss should result in consequence to the insured. * * *

"Insurance carries with it the idea of protection against some risk. If there were no risk, there would be no cause for insurance."

And it may be admitted that no title is ever free from some risk, for example, the familiar though rare assertion of dower or curtesy rights by an honestly or dishonestly undisclosed spouse who appears years after a conveyance and claims rights to the consternation of the then title holder who is usually several steps removed in the chain of title. Counsel urge that because no title can with absolute certainty be known to be perfect and there exists no instrument of precision to test it, the market place has evolved as an effective substitute by way of protection, the institution of title insurance, on which the market place must and does rely; and they urge that if "a law must be framed and judged of in consideration of the practical affairs of man" (Ballard v. Hunter, supra), the courts should in determining questions of marketability, or a reasonable doubt thereof, give great weight to evidence that the title was insurable.

I consider the argument persuasive and I am prepared to give it due weight. And I cannot but be impressed by Burdett's convincing evidence on this and other questions. An acknowledged expert and a senior officer of

the title company, he points out that the practice of his company has been to draw no distinction between a marketable and an insurable title, and to refuse insurance regardless of any additional premium proffered if there was any reasonable doubt of marketability; and that in this case, his company had agreed to insure at the customary and established rate which made the premium a mere $306.50 for insurance of a $160,000 risk. It is a lame answer suggested by Farley that the subsequent history of the title company has proved that its policy would have been a weak reed to rest upon; obviously, the many title companies now in rehabilitation have suffered reverses, not by reason of improvident title insurance, but because of business activities in a separate though related field, namely, the guarantee of the principal and interest of mortgages, and as every one knows, these have been in general default due to the very economic conditions which in my view dictated Farley's conduct in this case.

Against the extensive evidence of the New York Title Company report and offer of insurance, Farley contents himself with a brief assertion that the Connecticut company refused him insurance and he should not be compelled to take title if that company or some other one or any attorney on some future occasion might consider the title unmarketable. I find the record does not support this. Beyond Farley's mere assertion, I find no evidence that his Connecticut company definitely refused insurance. Their attorneys, it is true, for a time entertained what seems to me a fatuous doubt; but even they later reported the title marketable. In any event, against the extent and weight of the evidence presented by the receivers, Farley was called upon but failed to submit anything more contradictory than his own brief assertion.

The only case cited by the executors on the point under discussion is New York Investors v. Manhattan Beach Bathing Parks Corp., 229 App. Div. 593, 243 N. Y. S. 548. But I do not find that it is contrary to any of the views I have expressed. In the New York case, and that is the ground on which it was affirmed by the Court of Appeals in 256 N. Y. 162, at page 164, 176 N. E. 6, 7, it is said:

"The contract of sale provided that the plaintiff's title should be approved and insured by the Title Guarantee & Trust Company before the defendant should be obligated to accept the title and pay the purchase price. The record does not disclose an unequivocal approval of the title by the Title Guarantee & Trust Company. The defendant was not, therefore, bound to accept the title tendered." Specific performance was properly refused.

Obviously, in our case, the New York Title Company most unequivocally approved the title. I find no ground to disagree with the title company's certificate that this title on August 15, 1931, was marketable in accordance with the sales contract and therefore that the subsequent proceedings taken at Farley's urgent request in September and October of that year were unnecessary. It will be recalled that he, in consideration of the taking thereof, agreed to pay one-half the carrying charges during the several months prior thereto. However, it is certain there could have been no reasonable doubt as to the title when Farley, on November 25th of that year, committed his anticipatory breach; and to temper the wind to his executors in so far as the item of consequential damages is concerned, I shall hold that they are liable therefor from that date.

In a suit of this kind, consequential damages are in order. It would not be making the injured party whole merely to decree specific performance in its favor. In National Regulator Co. v. Abco Boiler Corp. (D. C.) 42 F.(2d) 712, unanimously affirmed without opinion by the Circuit Court of Appeals for the Second Circuit, in 42 F.(2d) 713, it was held that damages for unwarranted rejection of title at judicial sale can properly be assessed against the buyer. And in Feldman v. American Palestine Line, Inc., et al. (The President Arthur), 18 F.(2d) 749, the same Circuit Court of Appeals affirmed the District Court's decision that a purchaser at judicial sale who failed to complete his bargain until confronted with a rule nisi why he should not be punished for contempt, must pay to the receivers in equity, in addition to the purchase price, the cost of maintenance and upkeep of the property (in that case a vessel) from the date of confirmation of sale until the date when the default was cured and purchase price paid, and also as items of consequential damages, reasonable counsel fees, and the expenses of the receivers' solicitors, as fixed by the court, for their services in compelling performance by the defaulting buyer.

In this suit, the receivers have pointed out that unless and until the court shall have decided in their favor and shall have decreed specific performance or a resale of the property at the risk of the vendee for any deficiency, it would have been premature and impossible fully to present the evidence of consequential damage which resulted to the receivership from the buyer's default; and the receivers therefore requested and I so ruled at the oral argument, that if this proceeding be decided in their favor, they should be given an opportunity to present the evidence of such

consequential damage. Vis à vis, the vendee's executors requested and I so ruled at the oral argument, that if I find against them on the main question of liability and decree specific performance, they should be given an opportunity to present evidence of any facts concerning the financial condition of the testamentary estate which would make it inequitable for this court to enforce its decree of specific performance, and which might persuade this court, in the interest of justice, to apply a modified or different remedy as, for example, in Sullivan v. Associated Billposters and Distributors of United States and Canada et al. (C. C. A.) 6 F.(2d) 1000, 42 A. L. R. 503.

It is easy to sympathize with any one who, when he made his bargain, relied on prosperity being just around the corner; and in this case it cannot be doubted the receivers and creditors, with the approval of this court, were for a long time most sympathetic and patient, but it is equally clear that as between the vendee and his executors on the one hand, and the many persons interested in this receivership on the other, our duty is to do justice, tempered if possible with due regard for all the circumstances, but justice nevertheless.

The executors may have until June 28, 1934, to file herein and serve copies thereof on the receivers' solicitors of comprehensive affidavits as to the condition of the testamentary estate. And similarly, the receivers may have until that date to file and serve evidence of the items of consequential damage. In the meantime, an order and decree may be submitted in accordance with this opinion; and upon the submission of the aforesaid additional evidence and based thereon, I will entertain an application by either party on ten days' notice to the other, for any appropriate modification of that order and decree or for one supplementary thereto.