## Siddall v. Painter

*Robert B. Greer*, for plaintiff.

*Robert E. Porter* and *William C. Ferguson*, for defendant.

SWENEY, J., April 14, 1953.—This is a suit to recover hand money paid by plaintiff to defendant, under the terms of a written agreement of sale for a farm of 176.045 acres in Thornbury and Birmingham Townships, this county, for the price of $80,750. At the trial, a nonsuit was entered against plaintiff by the trial judge and we have before us for disposition a motion by plaintiff to remove this nonsuit.

The agreement of sale, dated February 11, 1952, contained, inter alia, the following provisions:

(a) Title was to be good and marketable and such as would be insured by any of three title insurance companies: Title Abstract Company, Land Title Bank and Trust Company, Commonwealth Title Insurance Company. If the title offered was not such, plaintiff (the purchaser) had the right (1) to rescind the contract, and (2) to have his down payment returned.

(b) Title was to be taken by plaintiff, subject to a written lease, dated January 29, 1951, expiring April 1, 1952 (without renewal clause) between defendant and a Mr. and Mrs. Dudley, with the right reserved to the Dudleys, as tenants, to remove waygoing crops.

(c) Possession was to be given at settlement by delivery of a deed and the assignment of said lease.

(d) Settlement was to be made on or before May 15, 1952.

Plaintiff declined to settle, giving as his reasons for such refusal:

1. That defendant's title to about 20 acres out of a total of a 176 acres of her farm was unmarketable, because defendant could not show in what manner she or her predecessors in title had acquired ownership thereof;

2. That defendant had leased the farm to tenants. Under the terms of said lease, lessees were to surrender, vacate, and deliver up the farm on April 1, 1952; the lease further provided that, if said tenants held over, the lessor was authorized to enter a judgment of ejectment by confession. The tenants held over after expiration of the lease. Plaintiff demanded that defendant take necessary action to evict the tenants, so that possession of the property could be delivered at the time of settlement. Defendant refused to evict tenants or to institute any legal proceedings to require the tenants to vacate the land. Subsequent to the expiration of the lease, the tenants plowed under several acres of sod grass, thereby committing waste.

3. That the tenants claimed the right to cut and remove alfalfa after the expiration of their term. This exceeded the right of the tenants to remove waygoing crops.

The burden of proof was upon plaintiff to show that defendant's title was unmarketable: Groskin v.

Knight, 290 Pa. 274. In assuming this burden, plaintiff showed that the Title Abstract Company, one of the title companies named in the agreement of sale to pass upon the marketability of the title, agreed to insure defendant's property at its usual and ordinary rates. Plaintiff's contention is that there is a real distinction between a "good and marketable" title and a title which a title company will insure "at regular rates"; the trial judge held that no title company would insure a title unless it were marketable and the fact that the Title Abstract Company would insure this title at regular rates was compliance by defendant with the terms of the agreement of sale and required plaintiff to accept the title.

The title search disclosed that there was a gap in the title covering 20 acres and occurring in 1734. On May 16, 1694, Jonathan Thatcher acquired title from John Baldwin and wife of a certain 124-acre farm. This farm contained the 20 acres in dispute. By deed, dated January 20, 1734, and recorded in Chester County in Deed Book "G" page 586, Jonathan Thatcher transferred the farm to William Brinton et al., as trustees for the grantor and his son, Richard Thatcher. Jonathan Thatcher retained a life estate with the remainder to his son, Richard. Richard Thatcher is a predecessor in title of defendant. No deed can be found conveying the 20 acres in the lifetime of Jonathan Thatcher; he died between 1747 and 1750 and, under his will, his estate passed to his son, Jonathan Thatcher, Jr. Defendant derives no title from Jonathan Thatcher, Jr.

From 1734 to date, this 20 acres in dispute has been part of the farm now sought to be sold by defendant. The ancestors of defendant, for a period of over 200 years, have been in continuous, uninterrupted, notorious, open and exclusive possession of this acreage. There is no record showing adverse claim to defendant

nor has any attempt been made by anyone during this period to eject defendant or her predecessors in title.

There are no cases in Pennsylvania which distinguish between a "good and marketable" title and an "insurable" title. It seems reasonable to infer from this that such a distinction is unnecessary, realizing that no title company will insure a title unless it is marketable. The language of the court in Plimpton v. Mattakeunk Cabin Colony, Inc., 9 F. Supp. 288, is very pertinent and to the point:

"The views of the other practitioners, including experts, are much stronger and to the effect that the proffer of such title policy insuring marketability is almost decisive and at any rate is deemed conclusive as a practical matter, that is, that in the market place and among counsel and according to the custom and usage, it is almost unheard of for a buyer to reject as unmarketable, a title insurable as marketable. . . .

"And it may be admitted that no title is ever free from some risk. . . . Counsel urge that because no title can with absolute certainty be known to be perfect and there exists no instrument of precision to test it, the market place has evolved as an effective substitute by way of protection, the institution of title insurance, on which the market place must and does rely; and they urge that if 'a law must be framed and judged of in consideration of the practical affairs of man', . . . the courts should in determining questions of marketability, or a reasonable doubt thereof, give great weight to evidence that the title was insurable."

A "marketable" title may be defined as a title free from defects subjecting it to reasonable doubt or leading a prudent man to reasonably expect litigation thereof: Smith v. Blinn et al., 221 Ala. 24, 127 So. 155; Mertens v. Berendsen, 213 Cal. 111, 1 P. 2d 440. A marketable title means a title free from all reasonable

doubt, but not from all possible doubt: Whittier Estates, Inc., v. Manhattan Savings Bank, 48 N. Y. S. 2d 111, 114.

Our case is similar in many respects to Spaulding v. Ferguson, 158 Pa. 219 (1893). In this case, it was held that plaintiff had a good and marketable title, because, although father, by will, devised three fourths of a tract of land to a son, with power of appointment, and made no disposition of the other quarter, the son took possession of the whole tract, devised it equally to all his children and, after his death, the children entered into an amicable partition of the whole tract and held it thus openly, continuously and adversely for more than 21 years.

See also Jaub v. Spector, 108 N. Y. S. 723 (1908) where no adverse claim was made over a period of 50 years.

If the only defect in the title is very remote and improbable, the title is marketable: Norwegian Evangelical Church v. Milhauser, 252 N. Y. 186 (1929), 169 N. E. 134. In this case, speaking for the court, Judge Cardozo says:

"We think the chance that there is a lawful heir of William A. Kinnilly capable of inheriting under the law governing inheritance as it stood in 1868 and capable today of making proof of his kinship, has become after all these years and all these repeated inquisitions a mere possibility, which ought no longer to impose a cloud upon the title. The law assures to a buyer a title free from reasonable doubt, but not from every doubt. . . .

"There is in all such controversies a penumbra where rigid formulas must fail. No test more definite can then be found than the discretion of the court, 'to be carefully and guardedly exercised' (Ferry v. Sampson, supra, 112 N. Y. 415, 20 N. E. 389) in furtherance of justice. In the exercise of that discretion, we de-

clare this title marketable; the doubt too unsubstantial to place the purchaser in peril."

In support of his contention, plaintiff is relying upon the case of New York Investors v. Manhattan Beach Bathing Park Association, 243 N. Y. S. 548, 176 N. E. 6 (affirmed in 256 N. Y. 640) as standing for the proposition that a title is not made "marketable" by the mere fact that a title company is willing to insure it. An examination of this case does not support this contention. The court says, inter alia:

"The contract of sale provided that the plaintiff's title should be approved and insured by the Title Guarantee and Trust Company before the defendant should be obligated to accept the title and pay the purchase price. The record does not disclose an unequivocal approval of the title by the Title Guarantee & Trust Company. The defendant was not, therefore, bound to accept the title tendered."

From this language it may be seen that defendant was not required to accept title because the title company did not unequivocally approve of the title, as required by the agreement of sale. In the instant case, the title company agreed to insure the title without exception at the regular rates for such service. It must also be noted that the New York case does not draw a distinction between marketable title and title insurance.

Plaintiff's second contention in his motion to take off the nonsuit is that the trial judge erred in ruling that the acts of the tenants were not grounds for recission of this contract. This contention raises several questions. First, does the action of the tenants in plowing sod on a farm constitute waste? Second, if waste was committed, who has the responsibility, under the terms of the written agreement herein, to enforce an action? Third, does the commission of waste by a tenant between the execution of the agreement

of sale and the date of settlement give legal grounds to avoid the contract?

In answer to the first question, we are of the opinion that the action of the tenants in plowing does not constitute waste. Under the lease, there is no provision for the use of this property other than as a farm. Proper rotation of crops requires the plowing of sodded meadows and the seeding of fields formerly used for crops. The other side of the story is that plaintiff was buying this property for development and in the usual course of construction of houses, streets and sidewalks, these same fields would have been plowed and regraded. As a consequence, the tenants were entirely within their rights and plaintiff was not injured.

But plaintiff says this plowing was done after April 1, 1952, the lease was at an end and the tenants were unlawfully in possession of the land; and, as a consequence, defendant was in default in refusing to honor plaintiff's demand that defendant commence the appropriate action in ejectment. It is undenied that plaintiff did request defendant to remove the tenants; that defendant refused to act, since the agreement provided that settlement should be held on or before May 15, 1952, and that, at settlement, possession should be given by proper deed and an assignment of the lease. We might well question the assignment of a lease which by its terms would end prior to settlement, but the contract of sale was made by the parties and we can only believe that plaintiff agreed to such terms because he was not decided what to do with the tenants and needed the lease and its provisions concerning ejectment in case plaintiff decided to have the tenants remove. We must conclude, therefore, that defendant had no responsibility to commence ejectment proceedings against the tenants.

As to the third question, there appears to be two different views. One line of cases holds that, after an

agreement of sale is entered into, there is an equitable conversion and the vendor no longer has rights in the real estate and, hence, cannot bring an action for damages, if the freehold is injured: Hess v. Vinton Colliery Company, 255 Pa. 78 (1916) ; Shinn v. Guyton and Harrington Mule Co., 109 Mo. App. 557, 83 S. W. 1015 (1904) ; Ives v. Cress, 5 Pa. 118 (1847).

The other line of cases appears to hold that the tenant is the tenant of the vendor even though the vendor and vendee have entered into a valid agreement of sale.

"The vendor, however, after the making of the contract and before the time for conveyance, has no right to commit what would ordinarily constitute waste, and if he does so, or permits it to be done, the purchaser is entitled to be reimbursed for the deterioration in value of the land or allowed a deduction from the purchase money as compensation for the injury done the land. If waste is committed, the vendor must tender compensation before he can require the vendee to perform his part of the contract": 55 Am. Jur. 812, §390. See also Durrett v. Simpson, 3 T. B. Mon. 517 (Ky.) ; Zierdt v. Kiel, 98 Pa. Superior Ct. 604 (1930) ; DuBois v. Baum, 46 Pa. 537 (1864) ; Lynch v. Wright, 94 Fed. 703 (1899) ; Weakland v. Hoffman, 50 Pa. 517 (1865), and 48 Harvard Law Review 821.

The line of cases holding the vendor liable for waste are stronger and better reasoned. The law of Pennsylvania seems to be in accord with this view, although a reasonably strong argument can be made to the contrary. However, we are prepared to hold in the instant case that the charge of waste made by plaintiff against defendant was not sufficient to rescind the contract. As we have already said we do not find in the plaintiff's case sufficient evidence of real deterioration of the property by or through waste; that even if there was waste, under the doctrine of de minimus,

it was not sufficient to entitle plaintiff to rescind. However, we are also considering the terms of the agreement of sale and the lease and, under the terms of both, there is, in our opinion, no foundation for plaintiff to rescind his agreement on the ground that waste has been committed for which defendant may be held responsible.

It is not necessary to discuss plaintiff's alleged right to rescind the agreement, because the tenants assert their right to remove alfalfa. It is obvious from the lease that the tenants have no such right, but their assertion of the right in no way affects the obligations between plaintiff and defendant.

### Decree

And now, April 14, 1953, the above matter having been argued before the court en banc, it is ordered and decreed that plaintiff's motion to remove the nonsuit herein entered be, and the same is hereby, dismissed.